# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **CARL E. JORDAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:19-cv-00907** |
| | ) | **Judge Aleta A. Trauger** |
| **WILLIAM LEE, Governor of the State** | ) | |
| **of Tennessee; DAVID RAUSCH, Director of** | ) | |
| **the Tennessee Bureau of Investigation;** | ) | |
| **and METROPOLITANGOVERNMENT** | ) | |
| **OF NASHVILLE-DAVIDSON COUNTY,** | ) | |
| **TENNESSEE,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Carl E. Jordan has filed a Motion for Preliminary Injunction (Docket No. 25), to which Governor William Lee and Tennessee Bureau of Investigation ("TBI") Director David Rausch, collectively, and the Metropolitan Government of Nashville and Davidson County ("Metro") have filed Responses (Docket Nos. 29 & 33). Metro has filed a Motion to Dismiss (Docket No. 27), to which Jordan has filed a Response (Docket No. 34), and Metro has filed a Reply (Docket No. 35). The Governor and Director have filed a Motion to Dismiss (Docket No. 30), which Jordan also addresses in the aforementioned Response (Docket No. 34), and the Governor and Director have filed a Reply (Docket No. 36). For the reasons set out herein, Metro's motion will be denied, the motion filed by the Governor and Director will be granted in part and denied in part, and Jordan's motion will be granted.

# I. BACKGROUND

## A. The Constitutional Prohibition on Ex Post Facto Punishments

The Constitution presupposes that the government may punish people for actions that have been deemed criminal. However, the government's authority to impose criminal punishment is subject to certain special constraints that may not apply to the government's other powers. One such constraint is the Constitution's ban on the adoption of "ex post facto Laws," set out in its Ex Post Facto Clauses, one of which applies to the federal government and one to the states. U.S. Const., art I, §§ 9, cl.3, 10, cl. 1.[1]

"Ex post facto law" is "a term of art" that, consistently with its "established meaning at the time of the framing," has been construed to refer to criminal, but not civil, laws that are retroactive in effect. *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 504 (1995) (quoting *Collins v. Youngblood*, 497 U.S. 37, 43 (1990)). *But see Collins*, 497 U.S. at 41 (acknowledging that a literal reading of the language would reach all, not merely criminal, laws). In its most straightforward formulation, the Ex Post Facto Clause dictates that "[l]egislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts." *Collins*, 497 U.S. at 43. "Through this prohibition, the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." *Weaver v. Graham*, 450 U.S. 24, 28–29 (1981) (citing *Dobbert v. Florida*, 432 U.S. 282, 298 (1977); *Kring v. Missouri*, 107 U.S. 221, 229 (1883); *Calder v. Bull*, 3 U.S. 386, 387 (1798)).

The Ex Post Facto Clause, on its face, contains no exceptions and makes no reference to the severity of either the crime committed or the punishment at issue. That is because the core

---

[1] The reference in this opinion to "the Ex Post Facto Clause" is to the state Clause, U.S. Const., art I, § 10, cl. 1, because it is the one relevant to this case.

interest protected by the Clause "is not an individual's right to less punishment," but rather the "lack of fair notice" given by the government. *Weaver*, 450 U.S. at 30. Accordingly, even an eminently reasonable punishment can violate the Ex Post Facto Clause if it was not authorized at the time that the underlying wrongful act was committed, and even a manifestly unjust and disproportionate punishment will find no obstacle from the Clause, as long as that punishment was authorized ahead of time. The Ex Post Facto Clause is concerned with timing and notice, not reasonableness in a larger sense.

While the core prohibition of the Ex Post Facto Clause is straightforward, courts have long struggled with its outer boundaries. For example, it is accepted as axiomatic that the Clause "forbids the application of any new punitive measure to a crime already consummated, to the detriment or material disadvantage of the wrongdoer." *Lindsey v. Washington*, 301 U.S. 397, 401 (1937) (citing *Kring*, 107 U.S. at 228–29; *Thompson v. Utah*, 170 U.S. 343, 351 (1898); *In re Medley*, 134 U.S. 160, 171 (1890)). Accordingly, a state could not retroactively turn a crime with a ten-year minimum sentence into one with a twenty-year minimum sentence. The actual practice of criminal punishment, however, involves more than merely imposing a sentence dictated by statute. The punishment that a convicted defendant will actually receive involves an array of judicial and administrative determinations, including the selection of a sentence from a range of possible options, the calculation of actual days to serve, the availability of "good time" or other post-conviction reductions in time to serve, and, of course, the availability of parole and the procedures that govern parole determinations. Faced with changes in these secondary determinants of a defendant's punishment, the Supreme Court's "cases 'have not attempted to precisely delimit the scope of'" the term "ex post facto law," "but have instead given it substance by an accretion of case law." *Peugh v. United States*, 569 U.S. 530, 538–39 (2013)

3

(quoting *Dobbert*, 432 U.S. at 292); *see, e.g.*, *id.* at 544 (holding that retroactive application of change in Sentencing Guidelines violated the Ex Post Facto Clause); *Lynce v. Mathis*, 519 U.S. 433, 446 (1997) (holding that retroactive cancellation of provisional early release credits violated the Ex Post Facto Clause); *Morales*, 514 U.S. at 514 (holding that retroactive application of law allowing for deferral of parole hearings did not violate the Ex Post Facto Clause); *Weaver*, 450 U.S. at 36 (holding that retroactive application of statute reducing availability of good time credits violated the Ex Post Facto Clause).

## B. Tennessee's Sexual Offender Registry and Restrictions on Registrants

Prior to 1994, individuals in Tennessee convicted of sexual offenses faced formal consequences that were mostly similar to those borne by individuals convicted of similarly serious non-sexual offenses. There may have been unique collateral consequences for sexual offenses in some areas—such as in family law proceedings—and defendants convicted of sexual crimes may have suffered especially severe extralegal reputational harms in their communities. For the most part, however, the path of a person convicted of a sexual offense was a familiar one: he[2] would be convicted and serve punishment, often in the form of incarceration, after which he might be paroled or, if not paroled, released when his sentence was completed. Then, if there were no other sentences or charges awaiting him related to other crimes, he would attempt to reintegrate into society.

In 1994, however, the Tennessee General Assembly, concerned with the potential actions of sexual offenders after they had served their sentences, adopted legislation requiring the TBI to "establish, maintain, and update a centralized record system of sexual offender registration and verification information." 1994 Tenn. Pub. Laws, ch. 976 § 7(a). The law required registration

---

[2] Of course, females may also be sex offenders. The court uses the male gender here only for ease of reference.

4

for all individuals convicted of any one of a number of identified sexual offenses, "unless the offender had been wholly released without supervision from incarceration, probation, or parole prior to January 1, 1995." *Doe v. Haslam*, No. 3:16-CV-02862, 2017 WL 5187117, at *1 (M.D. Tenn. Nov. 9, 2017) (Crenshaw, C.J.) (citing 1994 Tenn. Pub. Laws, ch. 976 § 3(2)–(3)). Accordingly, there existed a subset of defendants who were required to register based on crimes they committed before the registry was in place: namely, (1) convicted defendants who were still in the process of incarceration, parole, or supervision for a crime committed prior to 1995; and (2) individuals charged with committing crimes prior to 1995 but who had not yet been convicted.

The initial registration system was relatively undemanding and mostly concerned with ensuring the accuracy of registry information. A person convicted of a covered offense was required to register with the TBI by paper form within ten days of release without supervision from probation, parole, or incarceration. 1994 Tenn. Pub. Laws, ch. 976 § 4. The TBI would then send the registrant a fresh verification form every ninety days, which the registrant was required to return within ten days of receipt. *Id.* § 5. The registrant also had an ongoing duty to complete a new form within ten days of any change of residence. *Id.* § 4. The information in the registry was generally considered confidential, but the TBI or a local law enforcement agency could "release relevant information deemed necessary to protect the public concerning a specific sexual offender." *Id.* § 7(c). After ten years, a registrant could petition a court to order his removal from the registry, which the court would grant if it found the registrant had complied with the Act, was rehabilitated, and did not pose a threat to public safety. *Id.* § 8. There were no restrictions on where a registrant could live, work, or travel. *Doe*, 2017 WL 5187117 at *2.

In the ensuing decades, however, the Tennessee General Assembly repeatedly returned to the sexual offender registration statutes to change whom they reached, what they required, and how much protection they offered to registered offenders' privacy. Chief Judge Crenshaw of this district has recounted the statutes' long history of more than two dozen revisions in *Doe v. Haslam*, No. 3:16-CV-02862, 2017 WL 5187117, at *1 (M.D. Tenn. Nov. 9, 2017), and this court will refer to that opinion for the details. In short, Tennessee's sexual offender registration system progressed from a relatively simple system, dedicated to information gathering and tracking, into a far-reaching structure for regulating the conduct and lifestyles of registered sexual offenders after their punishments were complete and, in many cases, for the rest of their lives. The court will briefly summarize some of the key provisions in their current form.

1. Initial Eligibility and Levels of Offender

The current registration statute, the Tennessee Sexual Offender and Violent Sexual Offender Registration, Verification, and Tracking Act ("Act") dictates that individuals convicted of certain enumerated offenses must register with law enforcement for inclusion in a database maintained by the TBI. Offenses that require registration are mostly ones that, on their face, contain a sexual element, such as serial indecent exposure, aggravated rape, and rape of a child.[3] Tenn. Code Ann. § 40-39-202(20)(A)(vii), (31)(A), (D).

The Act divides registrants into "sexual offenders" and "violent sexual offenders," based primarily on the particular offense of which the person was convicted.[4] The term "violent sexual offenders" encompasses not only "sexual offenders who use physical violence" but also "[r]epeat sexual offenders" and "sexual offenders who prey on children." Tenn. Code Ann. §§ 40-39-

---

[3] It is possible, however, to qualify for registration based on the kidnapping of a child other than one's own, without any additional sexual component. Tenn. Code Ann. § 40-39-202(20)(a)(vi).

[4] A separate category exists for "violent juvenile sexual offenders," Tenn. Code Ann. § 40-39-202(28), which is not relevant to this case.

201(b)(1), 40-39-202(20), (30)–(31). A (non-violent) sexual offender may petition to be removed from the registry after ten years, and his petition will be considered in light of a number of factors, including his history of compliance with the Act's restrictions. A violent sexual offender, however, will remain on the registry for the remainder of his life. Tenn. Code Ann. § 40-39-207(g)(2).

A registered offender's Tennessee-issued driver's license will identify him as a sexual offender or violent sexual offender, as applicable. Tenn. Code Ann. § 55-50-353. He is required to carry his driver's license or equivalent government-issued photo identification card whenever outside his home. Tenn. Code Ann. § 40-39-213.

2. Registration and Updating Information

An offender registering for the first time must provide the following information, on penalty of perjury:

(1) Complete name and all aliases, including, but not limited to, any names that the offender may have had or currently has by reason of marriage or otherwise, including pseudonyms and ethnic or tribal names;

(2) Date and place of birth;

(3) Social security number;

(4) A photocopy of a valid driver license, or if no valid driver license has been issued to the offender, a photocopy of any state or federal government issued identification card;

(5) For an offender on supervised release, the name, address and telephone number of the registrant's probation or parole officer or other person responsible for the registrant's supervision;

(6) Sexual offenses or violent sexual offenses for which the registrant has been convicted, the date of the offenses and the county and state of each conviction; or the violent juvenile sexual offense for which the registrant has been adjudicated delinquent, the date of the act for which the adjudication was made and the county and state of each adjudication;

(7) Name of any current employers and length of employment, including physical addresses and phone numbers;

7

(8) Current physical address and length of residence at that address, which shall include any primary or secondary residences . . . ;

(9) Mailing address, if different from physical address;

(10) Any vehicle, mobile home, trailer or manufactured home used or owned by an offender, including descriptions, vehicle information numbers and license tag numbers;

(11) Any vessel, live-aboard vessel or houseboat used by an offender, including the name of the vessel, description and all identifying numbers;

(12) Name and address of each institution of higher education in this state where the offender is employed or practices a vocation or is a student;

(13) Race and gender;

(14) Name, address and phone number of offender's closest living relative;

(15) Whether victims of the offender's convictions are minors or adults, the number of victims and the correct age of the victim or victims and of the offender at the time of the offense or offenses, if the ages are known;

(16) Verification by the TBI or the offender that the TBI has received the offender's DNA sample;

(17) A complete listing of the offender's electronic mail address information, including usernames, any social media accounts the offender uses or intends to use, instant message, other internet communication platforms or devices, and the offender's username, screen name, or other method by which the offender accesses these accounts or websites;

(18) Whether any minors reside in the primary or secondary residence;

(19)(A) Any other registration, verification and tracking information, including fingerprints and a current photograph of the offender, vehicles and vessels, as referred to in subdivisions (i)(10) and (i)(11), as may be required by rules promulgated by the TBI . . . ;

(20) Copies of all passports and immigration documents; and

(21) Professional licensing information that authorizes an offender to engage in an occupation or carry out a trade or business.

Tenn. Code Ann. § 40-39-203(*i*). The Act provides that much of this information, including the registrant's photograph, address and employer, "shall be considered public information" and must be made available to the public through a web page. Tenn. Code Ann. § 40-39-206(d).

The offender also has an ongoing duty to keep the state's information up to date. "Within forty-eight (48) hours of establishing or changing a primary or secondary residence, establishing

8

a physical presence at a particular location, becoming employed or practicing a vocation or becoming a student in this state, the offender shall register or report in person" with the appropriate law enforcement agency.[5] Tenn. Code Ann. § 40-39-203(a)(1). A registrant also has 48 hours to report any "change in any other information given to the registering agency by the offender that is contained on the registration form" or any "material change in employment or vocation status." Tenn. Code Ann. § 40-39-203(a)(4), (6). The registrant has "three (3) days, excluding holidays" to report any change in his "electronic mail address information, any instant message, chat or other internet communication name." Tenn. Code Ann. § 40-39-203(7).

If the registrant fails to provide any of the required updated information within the time periods required, he has committed a Class E felony. Tenn. Code Ann. § 40-39-208(b). The registrant's first such offense is "punishable by a fine of not less than three hundred fifty dollars ($350) and imprisonment for not less than ninety (90) days." Tenn. Code Ann. § 40-39-208(c). The second violation "is punishable by a fine of not less than six hundred dollars ($600) and imprisonment for not less than one hundred eighty (180) days." Tenn. Code Ann. § 40-39-208(d). Any subsequent violations are "punishable by a fine of not less than one thousand one hundred dollars ($1,100) and imprisonment for not less than one (1) year." Tenn. Code Ann. § 40-39-208(e).

### 3. In-Person Reporting and Fees

The Act also requires periodic in-person reporting with the offender's designated law enforcement agency. Violent sexual offenders must "report in person during the months of

---

[5] Although the TBI administers the sexual offender registration itself, many of the ongoing activities related to registration are overseen by the registrant's "[d]esignated law enforcement agency," which is defined as "any law enforcement agency that has jurisdiction over the primary or secondary residence, place of physical presence, place of employment, school or institution of higher education where the student is enrolled or, for offenders on supervised probation or parole, the department of correction or court ordered probation officer." Tenn. Code Ann. § 40-39-202(2).

9

March, June, September, and December of each calendar year, to the designated law enforcement agency, on a date established by such agency, to update the offender's fingerprints, palm prints and photograph, as determined necessary by the agency, and to verify the continued accuracy of the information in the TBI registration form." Tenn. Code Ann. § 40-39-204(b)(1). Sexual offenders must report in person once a year. Tenn. Code Ann. § 40-39-204(c). At the sexual offender's check-in, or the violent sexual offender's first check-in, he is required to pay administrative fees not to exceed $150 to help cover the costs of his monitoring. Tenn. Code Ann. § 40-39-204(b)(1), (c). If the offender lives in a county or municipality that has adopted a "community notification system" to inform the public when a sexual offender moves in nearby, the offender may be liable for an additional $50 fee. Tenn. Code Ann. § 40-39-217(a)(2).

### 4. Restrictions on Where a Registrant Can Live or Work

A registered offender may not

> knowingly establish a primary or secondary residence or any other living accommodation or knowingly accept employment within one thousand feet (1,000') of the property line of any [1] public school, [2] private or parochial school, [3] licensed day care center, [4] other child care facility, [5] public park, [6] playground, [7] recreation center, or [8] public athletic field available for use by the general public.

Tenn. Code Ann. § 40-39-211(a)(1). There is an exception if the proximity exists solely because of the change in ownership of a property after the offender established the residence or began the job. Tenn. Code Ann. § 40-39-211(e). Violating this restriction is a Class E felony. Tenn. Code Ann. § 40-39-211(f). The first violation is "punishable by a fine of not less than three hundred fifty dollars ($350) and imprisonment for not less than ninety (90) days." Tenn. Code Ann. § 40-39-211(g)(1). The second violation "is punishable by a fine of not less than six hundred dollars ($600) and imprisonment for not less than one hundred eighty (180) days." Tenn. Code Ann. § 40-39-211(g)(2). Any subsequent violations are "punishable by a fine of not less than one

thousand one hundred dollars ($1,100) and imprisonment for not less than one (1) year." Tenn. Code Ann. § 40-39-211(g)(3).

<u>5. Restrictions on Registrant's Movements</u>

A registered offender is forbidden from knowingly

[b]e[ing] upon or remain[ing] on the premises of any building or grounds of any [1] public school, [2] private or parochial school, [3] licensed day care center, [4] other child care facility, [5] public park, [6] playground, [7] recreation center or public athletic field available for use by the general public in this state when the offender has reason to believe children under eighteen (18) years of age are present.

Tenn. Code Ann. § 40-39-211(d)(1). If the offender's victim was an adult, there are exceptions for certain expressly enumerated parenting-related activities, but those exceptions are only available if the offender has obtained "written permission or a request from the school's principal or the facility's administrator." Tenn. Code Ann. § 40-39-211(d)(2)(B).

An offender is also forbidden from "[s]tand[ing], sit[ting] idly, whether or not the offender is in a vehicle, or remain[ing] within one thousand feet (1,000') of the property line of any" of the aforementioned facilities "when children under eighteen (18) years of age are present, while not having a reason or relationship involving custody of or responsibility for a child or any other specific or legitimate reason for being there." Tenn. Code Ann. § 40-39-211(d)(1)(B).

A violation of either of these restrictions is a Class E felony. Tenn. Code Ann. § 40-39-211(f). The first violation is "punishable by a fine of not less than three hundred fifty dollars ($350) and imprisonment for not less than ninety (90) days." Tenn. Code Ann. § 40-39-211(g)(1). The second violation "is punishable by a fine of not less than six hundred dollars ($600) and imprisonment for not less than one hundred eighty (180) days." Tenn. Code Ann. § 40-39-211(g)(2). Any subsequent violations are "punishable by a fine of not less than one

11

thousand one hundred dollars ($1,100) and imprisonment for not less than one (1) year." Tenn. Code Ann. § 40-39-211(g)(3). A violation that is "due solely to a lack of the written permission required," however, is punishable only by fine. Tenn. Code Ann. § 40-39-211(g)(4).

In addition to those restrictions, a public library board "ha[s] the authority to reasonably restrict the access of any person listed on the sexual offender registry." Tenn. Code Ann. § 40-39-216(a). In order to exercise this power, the library must send notice to the offender's address listed in the registry. Shortly after notice is sent, the offender becomes liable for prosecution for criminal trespass, a Class C misdemeanor, if he violates the ban. Tenn. Code Ann. §§ 39-14-405(g), 40-39-216(d)–(e).

### 6. Additional Restrictions Related to Children

A registered offender may not "be alone with a minor or minors in a private area," defined generally as "any real or personal property, regardless of ownership, where the conduct of the offender is not readily observable by anyone but the minor or minors alone with the offender." Tenn. Code Ann. § 40-39-211(k)(1)(B), (2). Exceptions exist for the offender's own child, if certain criteria are met. Tenn. Code Ann. § 40-39-211(c), (k)(2). A violation is a Class E felony. Tenn. Code Ann. § 40-39-211(f). The first violation is "punishable by a fine of not less than three hundred fifty dollars ($350) and imprisonment for not less than ninety (90) days." Tenn. Code Ann. § 40-39-211(g)(1). The second violation "is punishable by a fine of not less than six hundred dollars ($600) and imprisonment for not less than one hundred eighty (180) days." Tenn. Code Ann. § 40-39-211(g)(2). Any subsequent violations are "punishable by a fine of not less than one thousand one hundred dollars ($1,100) and imprisonment for not less than one (1) year." Tenn. Code Ann. § 40-39-211(g)(3).

12

**C. Carl E. Jordan**[6]

On July 11, 1980, Jordan committed acts that led him to be charged, along with co-defendant Lewis Corbitt, with felony murder (of Bobby Reeves), first-degree burglary (of a residence), and aggravated rape of Freida Reeves. (Docket No. 10 ¶ 8.) Jordan pleaded guilty to armed robbery (of Freida Reeves),[7] aggravated rape, and the lesser included charge of second-degree murder. *State v. Jordan*, No. 85-265-III, 1986 WL 5038, at *1 (Tenn. Crim. App. May 2, 1986). He was sentenced to 40 years' incarceration. (Docket No. 10 ¶ 10.) Following an appeal, he was resentenced, on September 2, 1986, to 35 years. (*Id.* ¶¶ 13–14.)

In 2005, Jordan was released from prison. Shortly before his release, he was informed that he would need to register as a violent sexual offender under the Act. Because his conviction for aggravated rape qualifies him as a violent sexual offender, Tenn. Code Ann. § 40-39-202(31)(A), Jordan will remain subject to the Act for the rest of his life. He complains that his status as a registered offender has caused him to be rejected from jobs and living situations. (Docket No. 1 at 5–6.) He states that he has been charged for violations of the Act based on his failure to timely update his address and failure to pay his $150 fee. (*Id.* at 5.) According to his Amended Complaint, these charges occurred in 2011 and 2016. (Docket No. 10 ¶¶ 48–49.)

The First Amended Complaint states that Jordan worked at a warehouse for ten years after his release, but that, since that job ended in 2016, he has struggled to find replacement work, with potential employers expressly telling him they would not hire him because of his

---

[6] Most of these facts are taken from Jordan's First Amended Complaint (Docket No. 10), which is currently the operative complaint in this case. Where appropriate, however, the court will cite to Jordan's initial Complaint, which, although it is no longer the controlling pleading in this case, was, unlike the First Amended Complaint, certified under penalty of perjury. (Docket No. 1.)

[7] Although the relationship of Freida Reeves to Bobby Reeves is unclear, it is probably safe to assume that Jordan was not committing an armed robbery of a minor. Therefore, the court is presuming that the aggravated rape of Freida Reeves was the rape of an adult.

13

registry status. (*Id.* ¶¶ 38–41.) It states that he currently lives in what is "essentially a group home" and has been turned down for his own apartment because he is a registered violent sexual offender. (*Id.* ¶¶ 42–43.)

## D. Jordan's Lawsuit

On October 15, 2019, Jordan filed a *pro se* Complaint in this court, naming as defendants the Governor, the Director, Tennessee Attorney General and Reporter Herbert Slatery, the State of Tennessee, and a number of John and Jane Does. He sued the individual defendants in both their official and individual capacities. (Docket No. 1.) He alleged a number of constitutional violations related to his registry obligations, including violation of the Ex Post Facto Clause. (*Id.* at 6.) Jordan concluded his Complaint by certifying, under penalty of perjury, that its contents were true to the best of his knowledge, information, and belief. (*Id.* at 14.)

On February 13, 2020, the court appointed counsel to represent Jordan.[8] (Docket No. 7.) On April 1, 2020, Jordan, through his counsel, filed an Amended Complaint, this time naming as defendants the Governor, the Director, and Metro. (Docket No. 10.) The Amended Complaint states only one count, against all defendants, under 42 U.S.C. § 1983, for violation of Jordan's right to be free of *ex post facto* punishments. (*Id.* ¶¶ 59–64.) On June 9, 2020, Jordan filed a Motion for Preliminary Injunction asking that the defendants be enjoined from enforcing the Act against him. (Docket No. 25.) The defendants filed Motions to Dismiss. (Docket Nos. 27, 30.)

## II. LEGAL STANDARD

## A. Rule 12(b)(6) Motion to Dismiss

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as

---

[8] Jordan's appointed counsel was already representing another plaintiff who had raised an *ex post facto* challenge to his inclusion on the registry. *See Reid v. Lee*, Docket No. 3:20-cv-00050 (M.D. Tenn.).

true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

**B. Motion for Preliminary Injunction**

"Four factors determine when a court should grant a preliminary injunction: (1) whether the party moving for the injunction is facing immediate, irreparable harm, (2) the likelihood that the movant will succeed on the merits, (3) the balance of the equities, and (4) the public interest." *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 326 (6th Cir. 2019) (citing *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018); Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948 (3d ed. & Supp. 2019)). The district court must "weigh the strength of the four factors against one another," with

the qualification that irreparable harm is an "indispensable" requirement, without which there is "no need to grant relief *now* as opposed to at the end of the lawsuit." *Id.* (citing *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)). "Although no one factor is [otherwise] controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Mich. State AFL–CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997)).

## II. ANALYSIS

None of the defendants has advanced any procedural or jurisdictional argument against Jordan's claims. Rather, they argue that his claims should be dismissed because they would fail on the merits. Accordingly, there is considerable overlap between the court's consideration of the defendants' motions to dismiss and the first factor of the preliminary injunction inquiry, likelihood of success on the merits—with the important caveat that, while the court will assume that all of the assertions in Jordan's First Amended Complaint are true for the purposes of the Rule 12(b)(6) motions, it cannot do so with regard to his motion for a preliminary injunction. The court notes, however, that, unlike the First Amended Complaint, Jordan's original Complaint was signed by him under penalty of perjury. Although the original Complaint has been superseded as a "legally operative" pleading, *Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 306 (6th Cir. 2000), Jordan's counsel has relied on it as the equivalent of a sworn declaration to support his request for an injunction. Because the Complaint was sworn, and because it includes statements of autobiographical fact from Jordan's own life, of which he would have firsthand knowledge, the court will treat it as properly in consideration in support of the request for preliminary relief.

16

## A. Metro's Municipal Liability

Metro argues that Jordan has failed to plead facts sufficient to establish a § 1983 violation by Metro, itself, as an entity. Metro does not dispute that it has administrative duties under the Act or that it, through the Metropolitan Nashville Police Department ("MNPD"), enforces the Act. It argues, rather, that it is merely carrying out and enforcing state statutes, which it, as a municipality, should not be held liable for doing.

A government is responsible under § 1983 only for its "own illegal acts. [It is] not vicariously liable under § 1983 for [its] employees' actions." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (internal citations and quotation marks omitted). Accordingly, a local government entity can only be held liable under § 1983 if the plaintiff demonstrates that the alleged federal violation was a direct result of a municipal policy or custom. *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 693 (1978)); *Regets v. City of Plymouth*, 568 F. App'x 380, 393–94 (6th Cir. 2014)). A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom or tolerance or acquiescence of federal rights violations. *Burgess*, 735 F.3d at 478.

Jordan argues that he is suing Metro based on its existing policy and custom of proactively enforcing the Act indiscriminately against all offenders, including ones whose actions took place before 1995. He points to facts in his Complaint in support of Metro's affirmative enforcement of the Act, including MNPD's creation of a special unit to enforce

registry requirements and its own boasting of its activities in the MNPD employee newsletter. (Docket No. 10 ¶¶ 26–31.) Ultimately, Metro does not even necessarily dispute that it has a policy of enforcing the Act. Rather, it argues that, insofar as that policy exists, it is merely an artifact of Metro's general policy of enforcing state criminal laws. Metro argues that it, as a local government, should not, and cannot, be held liable under § 1983 merely for enforcing laws enacted at the state level.

Jordan admits that it is currently unsettled in the Sixth Circuit whether and when a municipality can violate § 1983 by enforcing a state law alleged to be unconstitutional. Insofar as other circuit courts have addressed the issue of municipal liability based on the municipality's actions under a flawed state law, they have been divided, although many of the relevant holdings have involved fine distinctions that might allow the cases to be reconciled. *Compare Whitesel v. Sengenberger*, 222 F.3d 861, 872 (10th Cir. 2000) (stating that a local government "cannot be liable for merely implementing a policy created by the state," although liability may attach if the local government was the "moving force" behind the violation); *Bockes v. Fields*, 999 F.2d 788, 791 (4th Cir. 1993) (holding that county board did not incur municipal liability by exercising case-specific discretion under state-created personnel policy)*; Surplus Store and Exch., Inc. v. City of Delphi*, 928 F.2d 788, 791 (7th Cir. 1991) ("It is difficult to imagine a municipal policy more innocuous and constitutionally permissible, and whose causal connection to the alleged violation is more attenuated, than the 'policy' of enforcing state law.") *with Evers v. Cty. of Custer*, 745 F.2d 1196, 1201 (9th Cir. 1984) (holding that local government's issuance of declaration consistent with state law was sufficient policymaking to create municipal liability); *Cooper v. Dillon*, 403 F.3d 1208, 1222–23 (11th Cir. 2005) (holding that municipality could be liable for enforcing an unconstitutional state statute when state law did not require enforcement).

18

Jordan urges the court to follow the lead of the Second Circuit in *Vives v. City of New York*, 524 F.3d 346 (2d Cir. 2008), and conclude that municipal liability can be premised on the local government's "conscious choice" to enforce a particular unconstitutional prohibition over which it had enforcement discretion. *Id.* at 352. The Second Circuit, in *Vives*, acknowledged that municipal liability must be based on a policy and that "[t]he word 'policy' generally implies a course of action consciously chosen from among various alternatives." *Id.* at 350. Accordingly, the court reasoned, a city cannot be held liable for its enforcement of a state law that "mandat[es] enforcement by municipal police officers," because it had no choice in the matter. *Id.* at 353. "On the other hand," the Second Circuit reasoned, "if a municipality decides to enforce a statute that it is authorized, but not required, to enforce, it may have created a municipal policy." *Id.*

The Second Circuit, however, stopped short of suggesting that a municipality's general policy of enforcing state criminal prohibitions would be sufficient to turn every such act of enforcement into a municipal policy for § 1983 purposes. Rather, "a municipal policymaker [must] have focused on the particular statute in question" and made the conscious choice affirmatively to enforce it. *Id.* at 353. In light of those principles, the Second Circuit adopted a two-part test: first, the court must determine whether a municipal government had a "meaningful choice" in whether and how to enforce the relevant state law; and, if the capacity for a meaningful choice did exist, the court must determine whether the relevant "discrete policy to enforce" the relevant law "represented a conscious choice by a municipal policymaker." *Id.*

The Sixth Circuit case most relevant to these issues appears to be *Garner v. Memphis Police Department*, 8 F.3d 358 (6th Cir. 1993), which involved the shooting of an individual by a police officer and which this court reads as consistent with the *Vives* approach. The officer in question was acting in accordance with the State of Tennessee's statutory policy on the use of

19

deadly force, as well as a Memphis policy that was "slightly more restrictive than the statute" in some ways, but which still permitted the use of deadly force in the manner relevant to that case. *Id.* at 361. As relevant to the shooting, in other words, the Memphis policy appears to have been merely a reiteration of the state statute. The court nevertheless concluded that the Memphis policy was sufficient to support municipal liability. The court noted, in particular, that Memphis could have adopted a policy stricter than the state's in the relevant respects but did not; accordingly, it made a "deliberate choice to follow a course of action from among various alternatives." *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)). That inquiry closely mirrors the first part of the *Vives* test, regarding meaningful choice. The second part of the *Vives* test, moreover, also would have been satisfied in *Garner*, because the written Memphis policy on use of force represented a conscious policy decision. Accordingly, while *Garner* is not directly applicable here—because it (1) did not involve an enforcement decision; and (2) involved a written policy—it supports the inference that the Sixth Circuit's view of the underlying principles is similar to the Second Circuit's.

Although *Garner* is a somewhat older case, it has been cited favorably by the Sixth Circuit on the issue of municipal liability in recent years. *See North v. Cuyahoga Cty.*, 754 F. App'x 380, 386 (6th Cir. 2018). The approach of *Garner* and *Vives*, moreover, captures the nature of the state-municipal relationship better than any other formulation the court has seen. "[M]unicipal governments in Tennessee derive the whole of their authority solely from the General Assembly." *S. Constructors, Inc. v. Loudon Cty. Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). They have no legal existence except as "emanation[s] from the state." *Maury Cty. ex rel. Maury Reg'l Hosp. v. Tenn. State Bd. of Equalization*, 117 S.W.3d 779, 787 (Tenn. Ct. App. 2003) (quoting *State ex rel. Bell v. Cummings*, 172 S.W. 290, 290 (1914)). In a sense,

therefore, *every* action that a municipality takes is, at least in part, the execution of a state statute. Municipalities, however, often have considerable discretion under those state statutes, and even Metro agrees that sometimes that discretion is used in a way that amounts to policymaking. The court sees no reason why discretion related to enforcement should be categorically exempt from at least consideration on those terms.

This court is therefore persuaded that the Second Circuit's approach in *Vives* is appropriate. It also appears, based on the pleadings and materials currently before the court, as well as a reading of Tennessee law, that Jordan can satisfy the first prong of the *Vives* test by establishing that Metro had a meaningful choice regarding whether to enforce the Act in the manner challenged. There are a handful of specific areas in which local law enforcement in Tennessee has mandatory enforcement duties. *See, e.g.,* Tenn. Code Ann. § 6-54-401 ("lewdness, drunkenness, gaming, and the sale and manufacture of intoxicating liquors"); Tenn. Code Ann. § 38-3-107 (riots and breaches of peace); Tenn. Code Ann. § 38-3-108 ("being armed with the intention of committing a riot or affray, or of assaulting, wounding, or killing another person, or of otherwise breaking the peace"). Unless a specific mandatory enforcement duty is established by statute, however, Tennessee's grants of enforcement powers to local law enforcement are "permissive" and do not "impose a mandatory duty to arrest every" violator. *Ezell v. Cockrell*, 902 S.W.2d 394, 403 (Tenn. 1995). While Metro had some mandatory administrative duties under the Act, it has identified no mandatory duty to enforce the Act against every offender (or, indeed, against any particular offender). It therefore appears that, if Metro wished not to enforce the Act against individuals whose long-ago crimes occurred before the registry's creation, it could do so. That satisfies the first *Vives* inquiry and opens the door to the second.

The court, therefore, must determine whether Jordan has adequately asserted that his constitutional injury is the result of a conscious decision of a Metro policymaker. In his briefing, Jordan first frames this question with regard to Metro's conscious choice to enforce the Act as a general matter, a fact that he has undoubtedly pleaded adequately. For example, he alleges that the formal duties of MNPD's Sex Crimes Unit were amended to include "responsibility for" offender registration, offender compliance, and coordination of enforcement actions. (Docket No. 10 ¶ 28.) Then, by 2018, MNPD established a separate Sex Offender Registry Unit to handle those responsibilities. (*Id.* ¶ 31.) While Jordan has not identified the policymaker responsible for these changes, the designation of a specific class of case within a unit's express purview can reasonably be read as a formal policy, at the municipal level, to engage in enforcement activities under the Act.

The court, however, is not convinced that municipal liability can attach merely because the municipality makes a conscious choice to enforce the Act in general. Municipal liability must be premised on a policy or custom that is a "moving force of the *constitutional violation*." *Monell*, 436 U.S. at 694 (emphasis added). The constitutional violation that Jordan has alleged is not enforcing the Act generally, but specifically enforcing the Act against an individual whose only qualifying crime or crimes were pre-1995.

The First Amended Complaint addresses this policy, albeit with less detail. Jordan alleges that, "throughout [the relevant] period, MNPD's policy has been to indiscriminately enforce Tennessee's [sexual offender registration] laws against all persons deemed under Tennessee law to be 'sexual offenders' and 'violent sexual offenders,' without excepting those persons whose offenses predated the passage of Tennessee's [sexual offender registration] laws." (Docket No. 10 ¶ 32.) For the purposes of Rule 12(b)(6), that is enough; Jordan is not required to make his

22

entire evidentiary case at the complaint stage, but merely to assert allegations giving rise to liability. He has alleged that Metro had a policy of providing no exceptions for individuals such as he. The court, therefore, will not dismiss the claim against Metro.

The court does acknowledge, however, that the question of municipal liability poses an additional caveat regarding Jordan's likelihood of success on the merits with regard to Metro and, therefore, is relevant to his request for a preliminary injunction. The court will consider Jordan's Ex Post Facto Clause argument below, but it is possible that he could succeed on that argument and still fail with regard to his municipal liability claim against Metro.

That said, there is at least some reason to infer that Metro did, in fact, make a conscious decision not to except offenders with pre-registry crimes from enforcement. First, as the court has noted, the alleged *ex post facto* issues surrounding the registry have been raised in litigation before, meaning that Metro decisionmakers may have been on notice that offenders such as Jordan posed special constitutional issues. Second, offenders' registry information itself was available to Metro, meaning the Metro decisionmakers had at least the opportunity to understand the demographic features of the offender population, including the fact that a subset of them committed crimes pre-registry. The court, therefore, does not consider this argument, in and of itself, to be inherently fatal to Jordan's receiving a preliminary injunction against Metro. The court does, however, acknowledge that municipal liability is a factor in that analysis.

## B. Individual Capacity Claims

Early in his First Amended Complaint, Jordan states that he seeks "money damages for his claims against the individual Defendants in their personal capacities." (Docket No. 10 ¶ 1.) Later in the First Amended Complaint, Jordan writes that "Rausch is a proper personal capacity defendant," as well as a proper official capacity defendant, "because he personally directs the

enforcement of [the Act] under color of state law"; however, Jordan alleges that the Governor is an appropriate defendant only in his official capacity. (*Id.* ¶¶ 58–59.) In the First Amended Complaint's request for relief, Jordan does not, in fact, seek money damages from either official, but only Metro. (*Id.* at 11.) The parties and the Clerk appear to have construed this situation as Jordan's having filed a claim against the Director, but not the Governor, in his personal capacity. The court will follow suit.

The Director argues that Jordan has failed to plead facts sufficient to support personal liability against him. In response, Jordan concedes the he "does not have any arguments to make to oppose dismissal of the personal capacity claim against" the Director, and he does not oppose the dismissal. (Docket No. 34 at 4, 7.) The court will therefore dismiss the claim against the Director in his individual capacity.

## C. Ex Post Facto Application of the Act

Next, the court must determine whether Jordan has adequately alleged an Ex Post Facto Clause violation and, if he has, whether he has shown a likelihood of success on the merits. The parties agree that the government may not "retroactively . . . increase the punishment for criminal acts." *Collins*, 497 U.S. at 43. It is also well-settled that this prohibition covers more than express changes to the particular statutory sentence associated with an offense. *Peugh v. United States*, 569 U.S. 530, 539 (2013) (noting that the Supreme Court has "never accepted the proposition that a law must increase the maximum sentence for which a defendant is eligible in order to violate the Ex Post Facto Clause.") (citing *Lindsey v. Washington*, 301 U.S. 397 (1937)). To the contrary, a state's "[s]ubtle ex post facto violation[]" is "no more permissible than [an] overt one[]." *Collins*, 497 U.S. at 46. The parties disagree, however, with regard to whether the parcel of obligations, liabilities, and restrictions arising out of the Act qualifies as a punishment or not.

24

The Supreme Court has held that a state's operation of a sexual offender registry that includes offenders whose crimes took place prior to the registry's adoption does not, in and of itself, amount to an Ex Post Facto Clause violation, because a simple registry, without additional harms and restrictions, is not inherently a mechanism of punishment. Specifically, in *Smith v. Doe*, 538 U.S. 84 (2003), the Supreme Court considered the constitutionality of the retroactive application of an Alaska sexual offender law that consisted of "two components: a registration requirement and a notification system." *Id.* at 90. To determine whether the registry amounted to a retroactive punishment, the Court applied the standard it had established in *Kansas v. Hendricks*, 521 U.S. 346, 366 (1997), which had involved a challenge to a statute governing involuntary commitment of certain mentally ill sexual offenders:

> We must "ascertain whether the legislature meant the statute to establish 'civil' proceedings." If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is "so punitive either in purpose or effect as to negate [the State's] intention to deem it 'civil.'"

*Smith*, 538 U.S. at 92 (quoting *Hendricks*, 521 U.S. at 361). The Court added that, because a legislature is entitled to considerable deference when it states its purpose, "'only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* (quoting *Hudson v. United States*, 522 U.S. 93, 100 (1997)). The Court concluded, based on the language of the Alaska statute, that the Alaska registry system was intended to be civil in nature, giving rise to a presumption that it was not punitive. *Id.* at 94–95.

The Court therefore turned to the question of whether the Alaska statute had a punitive purpose or effect. The Court concluded that its analysis should be guided by the factors related to

the punitive character of a statute set forth in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963):

> [1] Whether the sanction involves an affirmative disability or restraint, [2] whether it has historically been regarded as a punishment, [3] whether it comes into play only on a finding of scienter, [4] whether its operation will promote the traditional aims of punishment—retribution and deterrence, [5] whether the behavior to which it applies is already a crime, [6] whether an alternative purpose to which it may rationally be connected is assignable for it, and [7] whether it appears excessive in relation to the alternative purpose assigned.

*Id.* at 168–69 (internal footnotes omitted). Particularly relevant, the Court wrote, were the questions of whether the challenged regulation "has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose." *Smith*, 538 U.S. at 97.

Based on those factors, the Supreme Court concluded that the Alaska registration system was not punitive in character. Among the grounds for its conclusion was that the Alaska law "impose[d] no physical restraint." *Smith*, 538 U.S. at 100. The Court also noted that, unlike with criminal regimes such as probation, "offenders subject to the Alaska statute are free to move where they wish and to live and work as other citizens, with no supervision." *Id.* at 101. With regard to the lifelong duration of the reporting requirements for some offenders, the Court concluded it was not excessive, citing "[e]mpirical research" on recidivism among child molesters. *Id.* at 104.

A few years later, in *Doe v. Bredesen*, 507 F.3d 998 (6th Cir. 2007), the Sixth Circuit considered the application of the Ex Post Facto Clause to the version of the Tennessee registration regime in force at the time. As *Smith* requires, the court looked first to whether the Tennessee General Assembly had expressly designated the law as civil or whether it had

26

declared some punitive intent. The Act, then as now, included provisions stating that the purpose of the Act is public safety, that the Act "shall not be construed as punitive," and that "the general assembly does not intend that the information be used to inflict retribution or additional punishment on those offenders." Tenn. Code Ann. § 40-39-201(6), (8). The court therefore turned to the second part of the *Smith* inquiry, whether the punitive purpose or effect of the Act was sufficient to overcome the stated legislative intention. *Doe*, 507 F.3d at 1004. Relying on the multi-factor *Mendoza-Martinez* test, the court concluded that the Act was not punitive. The court noted, in particular, that "registration, reporting, and surveillance components are not of a type that we have traditionally considered as a punishment" and that the Act does not "prevent [a registered offender] from changing jobs or residences or traveling to the extent otherwise permitted by their conditions of parole or probation."[9] *Id.* at 1005.

Meanwhile, the Tennessee General Assembly continued its pattern of expanding the requirements of the registration regime by amendment, particularly with regard to geographic restrictions on an offender's actions and lifestyle. For example, restrictions about entering schools, playgrounds and other facilities were added in 2008. *See* 2008 Tenn. Pub. Acts, ch. 1164, § 11. Restrictions related to libraries were added in 2011. *See* 2011 Tenn. Pub. Acts, ch. 287. The Act's residence restrictions regarding schools and other facilities were extended to offenders whose victims were adults in 2014. *See* 2014 Tenn. Pub. Acts, ch. 992, § 1. The

---

[9] The Act did, in fact, restrict where a registered offender could live or work, which had been discussed at length at the district court level. The district court, consistently with the law, concluded that the Act did not restrict the ability to move or change jobs, but rather that, "[w]hile provisions of the Act restrict sexual offenders from establishing a residence or employment within a certain radius of schools or child care facilities, offenders do not need permission to move or change jobs and are free to live and work away from those restricted areas." *Doe v. Bredesen*, No. 3:04-CV-566, 2006 WL 849849, at *8 n.5 (E.D. Tenn. Mar. 28, 2006). The court construes the Sixth Circuit's opinion as making the same point rather than suggesting that changing jobs or residences were not impeded to any extent.

prohibition on being alone with children other than one's own in a "private area" were added in 2015. *See* 2015 Tenn. Pub. Acts, ch. 516.

In 2016, the Sixth Circuit considered the issue of retroactive application of registration laws anew in *Does #1-5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016). That case involved Michigan's sexual offender registration system, which, the court wrote, "began in 1994 as a non-public registry maintained solely for law enforcement use" but "ha[d] grown into a byzantine code governing in minute detail the lives of the state's sex offenders." *Id.* at 697. The court recounted a history of amendments strikingly similar, though not identical, to Tennessee's:

> Over the first decade or so of SORA's[10] existence, most of the changes centered on the role played by the registry itself. In 1999, for example, the legislature added the requirement that sex offenders register in person (either quarterly or annually, depending on the offense) and made the registry available online, providing the public with a list of all registered sex offenders' names, addresses, biometric data, and, since 2004, photographs. *See* Mich. Pub. Act 85 §§ 5a(4), 8(2), 10(2)(3) (1999); Mich. Pub. Acts 237, 238 (2004). Michigan began taking a more aggressive tack in 2006, however, when it amended SORA to prohibit registrants (with a few exceptions, *see* Mich. Comp. Laws § 28.734–36) from living, working, or "loitering" within 1,000 feet of a school. *See* Mich. Pub. Acts 121, 127 (2005). In 2011, the legislature added the requirement that registrants be divided into three tiers, which ostensibly correlate to current dangerousness, but which are based, not on individual assessments, but solely on the crime of conviction. *See* Mich. Pub. Acts 17, 18 (2011). The 2011 amendments also require all registrants to appear in person "immediately" to update information such as new vehicles or "internet identifiers" (e.g., a new email account). *See id.* The 2006 and 2011 amendments apply retroactively to all who were required to register under SORA. *See* Mich. Pub. Act 46 (2006); Mich. Pub. Acts 17, 18 (2011). Violations carry heavy criminal penalties. See Mich. Comp. Laws § 28.729.

*Snyde*r, 834 F.3d at 697–98. Five plaintiffs challenged the law on various grounds, including the Ex Post Facto Clause. The case went to a bench trial, which permitted the development of a significant factual record. The Sixth Circuit, based on that record, noted that the plaintiffs "had

---

[10] "SORA" stands for "Sex Offender Registration Act," an acronym used for Michigan's Act and also used generically to refer to many states' acts, including often Tennessee's—even though that is not actually the present name for the Act.

28

trouble finding a home in which they c[ould] legally live or a job where they c[ould] legally work," and "those Plaintiffs who ha[d] children (or grandchildren)" were prevented "from watching them participate in school plays or on school sports teams" or from "visiting public playgrounds with their children for fear of 'loitering.'" *Id.* at 698.

The Sixth Circuit performed the first step of the *Smith* analysis and found—as courts typically do[11]—that the statute purported to be civil and non-punitive on its face. *Id.* at 700–01. The court then focused the second part of the *Smith* analysis on the five *Mendoza-Martinez* factors that *Smith* had identified as particularly salient in registry cases:

> (1) Does the law inflict what has been regarded in our history and traditions as punishment?

> (2) Does it impose an affirmative disability or restraint?

> (3) Does it promote the traditional aims of punishment?

> (4) Does it have a rational connection to a non-punitive purpose?

> (5) Is it excessive with respect to this purpose?

*Id.* at 701 (citing *Smith*, 538 U.S. at 97.)

With regard to the first factor—history and tradition—the court noted that, although Michigan's act had "no direct ancestors in our history and traditions," it "resemble[d], in some respects at least, the ancient punishment of banishment" as well as "traditional shaming punishments." *Id.* at 701–02. The court cited evidence that vast swathes of the state's more populous areas were unavailable to the registrants for living or working, and the registrants were branded with derogatory classifications that did not reflect an individualized determination that

---

[11] Indeed, it is difficult for this court to see how any retroactive law enacted or amended since *Smith* is likely to fail the first portion of the test, other than through legislative inadvertence. Any legislature that wishes its enactment to survive constitutional review knows that it can, while sacrificing nothing of the content of the statute, include a *pro forma* claim of civil intent and become eligible for deferential review under *Smith*.

the descriptor was justified. *Id.* The court also observed that life under the Michigan system, unlike life under the Alaska system upheld in *Smith*, "resembles the punishment of parole/probation." *Id.* at 703. The court explained:

> registrants are subject to numerous restrictions on where they can live and work and, much like parolees, they must report in person, rather than by phone or mail. Failure to comply can be punished by imprisonment, not unlike a revocation of parole. And while the level of individual supervision is less than is typical of parole or probation, the basic mechanism and effects have a great deal in common. In fact, many of the plaintiffs have averred that SORA's requirements are more intrusive and more difficult to comply with than those they faced when on probation.

*Id.*

The court also found that the second factor—affirmative disability and restraint—favored a finding of punitive effect, in light of the aforementioned restrictions on a registered offender's residence, work, and movement. The court observed that those restrictions amounted to "restraints . . . greater than those imposed by the Alaska statute [at issue in *Smith*] by an order of magnitude." *Id.* With regard to factor three—the traditional aims of punishment—the court concluded that the Michigan act

> advances all the traditional aims of punishment: incapacitation, retribution, and specific and general deterrence. Its very goal is incapacitation insofar as it seeks to keep sex offenders away from opportunities to reoffend. It is retributive in that it looks back at the offense (and nothing else) in imposing its restrictions, and it marks registrants as ones who cannot be fully admitted into the community. Further, . . . it does so in ways that relate only tenuously to legitimate, non-punitive purposes. Finally, its professed purpose is to deter recidivism . . . , and it doubtless serves the purpose of general deterrence.

*Id.* at 704.

The last two factors—rational relationship to purpose and excessiveness—are closely related because they both consider the degree to which a law serves its stated civil purpose, as opposed to, for example, a desire for retribution or stigmatization appropriate only in the

criminal context. The Sixth Circuit found that, based on the evidence in the record, the connection between the registration regime and its stated public safety purposes was weak. The court noted a study "suggest[ing] that sex offenders (a category that includes a great diversity of criminals, not just pedophiles) are actually *less* likely to recidivate than other sorts of criminals." *Snyder*, 834 F.3d at 704 (citing Lawrence A. Greenfield, Recidivism of Sex Offenders Released from Prison in 1994 (2003)). "In fact," the court observed, "one statistical analysis in the record concluded that laws such as SORA actually *increase* the risk of recidivism, probably because they exacerbate risk factors for recidivism by making it hard for registrants to get and keep a job, find housing, and reintegrate into their communities." *Id.* at 704–05 (citing J.J. Prescott & Jonah E. Rockoff, *Do Sex offender Registration and Notification Laws Affect Criminal Behavior?*, 54 J.L. & Econ. 161, 161 (2011)). Likewise, with regard to excessiveness, the court observed that the Michigan law imposed a number of laborious requirements on offenders for which the actual public safety benefits were, at best, speculative, concluding that the "punitive effects of these blanket restrictions thus far exceed even a generous assessment of their salutary effects." *Id.* at 705.

The court accordingly found that the Michigan law was punitive in effect and could not be imposed retroactively. *Id.* (collecting similar holdings from other courts). The court forcefully explained:

> A regulatory regime that severely restricts where people can live, work, and "loiter," that categorizes them into tiers ostensibly corresponding to present dangerousness without any individualized assessment thereof, and that requires time-consuming and cumbersome in-person reporting, all supported by—at best—scant evidence that such restrictions serve the professed purpose of keeping Michigan communities safe, is something altogether different from and more troubling than Alaska's first-generation registry law. SORA brands registrants as moral lepers solely on the basis of a prior conviction. It consigns them to years, if not a lifetime, of existence on the margins, not only of society, but often, as the record in this case makes painfully evident, from their own families, with whom,

due to school zone restrictions, they may not even live. It directly regulates where
registrants may go in their daily lives and compels them to interrupt those lives
with great frequency in order to appear in person before law enforcement to report
even minor changes to their information.

We conclude that Michigan's SORA imposes punishment.

*Id.* at 705.

## 2. Application of *Snyder* to this Case

The similarities between Tennessee's registration system and Michigan's suggest that
much of the analysis of *Snyder* could apply here. Before the court goes down that road, however,
it must address a preliminary matter. Earlier versions of Tennessee's sexual offender registration
system have already been held to be non-punitive by the Sixth Circuit, most recently in *Doe v.
Bredesen*. *See also Cutshall v. Sundquist*, 193 F.3d 466, 479 (6th Cir. 1999) (upholding
registration prior to *Smith*). *Snyder*, like *Doe v. Bredesen*, was a panel decision, and "one panel
of [the Sixth Circuit] may not overrule the decision of another panel; only the *en banc* court or
the United States Supreme Court may overrule the prior panel." *United States v. Ferguson*, 868
F.3d 514, 515 (6th Cir. 2017) (citing *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685,
689 (6th Cir. 1985)). This court, accordingly, is bound to treat both *Snyder* and *Doe v. Bredesen*
as correctly decided, based on the law of the time and the details of the respective cases. The
question, therefore, arises of whether this court can rely on *Snyder*'s analysis of the Michigan
statute to reach a different ultimate conclusion than that reached in *Doe v. Bredesen* about
Tennessee's statute.

Luckily, this court is not the first to grapple with that question. The Sixth Circuit's
opinion in *Snyder*—for which the Supreme Court declined to grant certiorari, 138 S. Ct. 55—has
led a growing number of courts and litigants to revisit the permissibility of applying Tennessee's
Act retroactively, and the courts have not hesitated to consider *Snyder*. This court has already

32

mentioned Chief Judge Crenshaw's opinion in *Doe v. Haslam*, 2017 WL 5187117, in which he declined to dismiss an *ex post facto* challenge to the Act, despite the defendants' arguing that *Doe v. Bredesen* foreclosed such a holding. Chief Judge Crenshaw wrote that, although *Snyder* did not overrule *Doe v. Bredesen*, "Tennessee's scheme has been amended in meaningful respects since" *Doe v. Bredesen* was decided, leaving open the door for a fresh consideration in light of new precedent. *Doe v. Haslam*, 2017 WL 5187117, at *19. Based on the *Snyder* analysis, Chief Judge Crenshaw concluded that the plaintiffs had stated an *ex post facto* violation sufficiently to avoid dismissal. *Id.* at *20.

The Eastern District of Tennessee considered similar challenges in *Doe v. Gwyn*, No. 3:17-CV-504, 2018 WL 1957788 (E.D. Tenn. Apr. 25, 2018), and *Doe v. Rausch*, 382 F. Supp. 3d 783, 788 (E.D. Tenn. 2019). *Gwyn*, like *Doe v. Haslam*, involved a motion to dismiss. The court found no obstacle to applying *Snyder* as the law of the circuit. Rather, the court simply noted that *Doe v. Bredesen* had involved a "prior version[] of Tennessee's" statute, while the court's job in *Gwyn* was to review the current version *Id.* at *7 n.6. Applying the analysis refined in *Snyder*, the court concluded that "the plaintiff has alleged a plausible claim that the present version of the Act is so punitive in effect as to violate the Ex Post Facto Clause." *Id.* at *8 (citing *Doe v. Miami-Dade Cty.*, 846 F.3d 1180, 1185–86 (11th Cir. 2017)).

*Doe v. Rausch* involved a motion for summary judgment and therefore, like *Snyder*, was based on a significant factual record. The court again noted that *Doe v. Bredesen* involved a "prior iteration[] of Tennessee's sex offender registration law" and went on to consider the amended version under *Snyder*. *Rausch*, 382 F. Supp. 3d at 793. Based on the available record, the court concluded that the analysis in *Snyder* was equally persuasive with regard to the amended Tennessee Act, at least as applied to that plaintiff:

> The Act has limited where he can live, work, gather with family, and travel without any individualized assessment of whether those restrictions are indeed necessary to protect the public from any future crimes he may commit. There has been no showing that the benefits to the State outweigh the negative consequences to Plaintiff. There has been no individualized attempt to justify the continued imposition of these restrictions on Plaintiff for life. Moreover, the State has not presented any countervailing evidence to refute the Plaintiff's "clearest proof" of the punitive effects of the Act on him. The Court finds that the retroactive imposition of lifetime compliance with the Act is an unconstitutional Ex Post Facto law as applied to the Plaintiff.

*Id.* at 799–800. The plaintiff accordingly was entitled to summary judgment with regard to his Ex Post Facto Clause claim. *Id.* at 800.

This court has no difficulty joining Chief Judge Crenshaw and the Eastern District to consider Tennessee's current law under *Snyder. Doe v. Bredesen* is still precedent in this circuit, but the statute that the court considered in that case is not the same as the statute in effect today. The two versions of the Tennessee statute are similar; but Michigan's statute was also similar, in many ways, to the *Doe v. Bredesen* statute, and the Sixth Circuit nevertheless recognized that a fresh analysis was still permissible. One panel of the circuit may not overrule another, but it is free to refine the circuit's caselaw in a way that cautions district courts not to extrapolate too freely from an earlier case. The Sixth Circuit, in *Snyder*, did not overrule its earlier cases, but it did make clear that *Doe v. Bredesen* should not be viewed as mandating a rubber stamp for more restrictive registration regimes. Refusing to consider the current law under *Snyder* and instead assuming that *Doe v. Bredesen* has blessed Tennessee's regime for perpetuity would be "disregard[ing] binding precedent from the Sixth Circuit." *Rausch*, 382 F. Supp. 3d at 795 (citations omitted). The court, therefore, will apply *Snyder* to the case currently before it.

Once one concludes that the court can consider Tennessee's law under *Snyder*, this becomes an easy case, at least with regard to the motions to dismiss. Virtually every observation that the Sixth Circuit made about the Michigan regime could be made about the Act with, at

most, minimal tweaking. In terms of the multi-factor test, the Act, like Michigan's law, imposes a system that, in many ways, is simply a modern hybrid of the traditional punishments of banishment, shaming, and probation. It places significant restrictions on a registrant's physical freedom in the world, including by restricting where he can live or work and whether he can enter his children's schools. Its consequences are harsh, and there exist significant questions about whether any purpose beyond retribution and punishment could justify those consequences. Based on his allegations, Jordan is entitled to pursue discovery in an attempt to establish that Tennessee's system is just as faulty as Michigan's. The court, accordingly, will deny the motions to dismiss.

The defendants argue that, even if Jordan's allegations are sufficient to allow his claims to proceed, he has not presented the developed evidentiary record that undergirded the holdings in *Snyder* and *Rausch*, and he therefore is not entitled to a preliminary injunction. Much of the analysis of *Snyder* is purely legal in nature and can be applied here based solely on a reading of the Act. Some of *Snyder*'s analysis, however, is indeed fact-intensive, particularly regarding, first, the severity of the law's restrictions as applied in the real world and, second, the evidence, or lack thereof, of the registration system's efficacy.

Jordan, however, has presented at least some evidence of the effect of the Act on his life. He has been arrested and charged under the Act for failing to do things—pay his $150 fee and update his address—that, but for the Act, he would not have been required to do. (Docket No. 1 at 5.) Indeed, having to pay an annual $150 fee for the rest of one's life is, in and of itself, a hardship of some degree, even if it, alone, might not support an Ex Post Facto Clause challenge. He has stated that he was denied housing based on his sexual offender status, which the defendants have not refuted. (*Id.* at 6.) He has also stated that he was denied employment. (*Id.* at

35

5.) Admittedly, the record is limited with regard to these incidents, and the court does not know whether he was denied housing and work based on the stigma of his registry status or the fact that the relevant home or job conflicted with the Act. Both the Act's restrictions on freedom and its stigmatic harms, however, are relevant to the question of whether it is punitive, so either possibility supports his claims.

Moreover, the effects of many of the Act's provisions are simple enough for the court or anyone else to surmise based merely on an ordinary understanding of day-to-day life, which the court is not required to ignore. Rule 201 of the Federal Rules of Evidence permits a court, either by motion of a party or on its own motion, to "judicially notice a fact that is not subject to reasonable dispute because it" either "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." For example, judicial notice permits a court to acknowledge certain indisputable foundational facts about life in a jurisdiction, such as the region's geography, *see Tucker v. Outwater*, 118 F.3d 930, 935 (2d Cir. 1997), its recurring weather conditions, *see Stephan v. Transp. Ins. Co.*, 140 F. App'x 340, 341 (3d Cir. 2005), or widely known demographic facts, *see Caulfield v. Bd. of Educ. of City of N.Y.*, 486 F. Supp. 862, 885 (E.D.N.Y. 1979). "[C]aution must be used" in taking judicial notice under Rule 201, in part because judicial notice can have the effect of "depriv[ing] a party of the opportunity to use rebuttal evidence, cross-examination, and argument to attack" the assertion at issue. *Countrywide Home[] Loans, Inc. v. McDermott*, 426 B.R. 267, 273 (N.D. Ohio 2010) (quoting *Am. Prairie Constr. Co. v. Hoich*, 560 F.3d 780, 796 (8th Cir. 2009)). Nevertheless, judicial notice is an indispensable tool, because it allows the court to bypass unnecessary inquiries to get to the actual disputed heart of the case. Taken to its extreme, a world without judicial notice would be one in which every case

36

about a slip-and-fall would require testimony from a physicist establishing that gravity exists. The court is not required to feign ignorance about facts no one can reasonably dispute.

Jordan may want, and ultimately need, to present a good deal more evidence in this case. For now, however, the court can take judicial notice of some basic facts. For example, Jordan has provided evidence that he lives in Nashville (Docket No. 1 at 2), and, while the court has no evidence of the full number of parks, schools, child care facilities, and recreation areas in city, the court can take judicial notice of what anyone else in Nashville can see: that those locations are numerous and spread throughout at least much of the city. The court can take judicial notice of the fact that many jobs require an individual to spend at least some amount of time in or near those facilities. The court can also take judicial notice of the fact that the phrase "violent sexual offender," when affixed to a person without explanation, carries with it a significant stigma.

The most significant deficiency in the factual record before the court is that Jordan, unlike the plaintiffs in *Snyder*, has not provided empirical studies regarding the effectiveness of the Act. The defendants, however, have offered the court no reason to think that this factor would apply differently in Tennessee than it does in Michigan, and the court can at least rely on Jordan's own experience as an example. There is no evidence in the record that there is a public safety benefit to, for example, restricting Jordan's ability to "stand idly" somewhat near a school. The only evidence of Jordan's particular dangerousness in 2020 is the fact that he committed violent crimes forty years ago, for which he served a lengthy prison sentence that, according to the justice system of the time, was adequate and proportionate. No up-to-date determination has been made about if he is dangerous, whom he might be dangerous to, or what steps are necessary to abate that danger. Nevertheless, the Act treats him as not only dangerous but specifically dangerous to children—so dangerous to children, in fact, that every moment of his life must be

37

built around keeping him away from them. None of the defendants has offered any meaningful rationale for why that might be necessary.

These facts are enough to establish a strong likelihood of success, because they are enough to strongly suggest that the analysis that governed *Snyder* would prevail here. And, while additional issues of municipal liability lower the likelihood of success against Metro, the court concludes that the likelihood of success in that regard is nevertheless at least substantial. Jordan, accordingly, has established that the first preliminary injunction factor strongly supports granting him the relief he requests.

## C. Remaining Preliminary Injunction Factors

Having determined that Jordan has a high likelihood of success on the merits with regard to his claims against the Governor and Director and at least a significant likelihood of success with regard to his claims against Metro, the court must turn to the remaining factors governing the consideration of a request for a preliminary injunction.

### 1. Irreparable Harm to the Plaintiff

The Sixth Circuit has held that, "if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001). At the very least, "irreparable injury is presumed." *Am. Civil Liberties Union Fund of Mich. v. Livingston Cty.*, 796 F.3d 636, 649 (6th Cir. 2015) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)). Jordan's establishing a likelihood of success on the merits is, therefore, also enough to establish that this factor weighs in favor of granting his motion.

The third and fourth factors of the preliminary injunction analysis—harm to others and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). With regard to these factors, the defendants make only a general allusion to the state's interest in enforcing the Act and protecting the safety of the public. There is no evidence before the court, however, that Jordan currently poses a threat to anyone—or that any such threat would be mitigated by requiring him to continue as a registered violent sexual offender.

There is, moreover, no evidence that granting Jordan's request would place an administrative burden on the defendants. By its own terms, the registry is designed to have individuals added and removed from its rolls with regularity, so there is no reason to think that removing Jordan would be difficult, or that it would be difficult to re-add him at a later date if necessary. Indeed, any costs to the defendants appear to be so minimal that the court concludes that no cash surety would be necessary "to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

Finally, it is well-established that "the public interest is served by preventing the violation of constitutional rights." *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004). Granting Jordan the relief he seeks would not merely be benefiting him, but honoring a core constitutional commitment, recognized since the nation's earliest days. Although the Supreme Court has held that a state is permitted to retroactively include an offender in a simple registry, Tennessee is not free to use its registry as a back door to heap an endless parade of new and severe punishments on individuals whose long-ago offenses carried no such consequences when committed. Recognizing that a registry is not a license to violate the

Ex Post Facto Clause would advance the public's interest in constitutional governance bound by law. This factor, therefore, also supports granting the preliminary injunction.

## D. Balancing the Preliminary Injunction Factors

All of the factors relevant to the court's consideration of Jordan's request line up in favor of granting him the narrow relief he seeks. Jordan has not sought to disrupt or obstruct the functioning of Tennessee's system of sexual offender registration in any general way. He simply asks that he, personally, be removed from that system on the ground that he was unconstitutionally brought into it. Because Jordan has demonstrated his likelihood of success on the merits, shown the irreparable harm that registration is doing to him now, and established that the public interest would be served by his removal, he is entitled to a preliminary injunction.

## V. CONCLUSION

For the foregoing reasons, Jordan's Motion for Preliminary Injunction (Docket No. 25) will be granted, the Motion to Dismiss filed by Metro (Docket No. 27) will be denied, and the Motion to Dismiss file by the Governor and the Director (Docket No. 30) will be granted in part and denied in part.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

40