# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# AT NASHVILLE

| | | |
|---|---|---|
| CARL JORDAN, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:19-cv-00907 |
| | ) | |
| WILLIAM LEE, Governor of the State of Tennessee, in his official capacity; DAVID B. RAUSCH, Director of the Tennessee Bureau of Investigation, in his official capacity; and METROPOLITAN GOVERNMENT OF NASHVILLE-DAVIDSON COUNTY, TENNESSEE, | ) ) ) ) ) ) ) ) | District Judge Aleta A. Trauger |
| | ) | |
|     Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS WILLIAM LEE AND DAVID RAUSCH

Defendants William Lee, Governor, and David B. Rausch, Director of the Tennessee Bureau of Investigation ("the State Defendants"), submit this Memorandum of Law in Support of their Motion for Summary Judgment. The State Defendants should be granted summary judgment because Plaintiff cannot bear his heavy burden of proof to show that applying the Act to him violates the Ex Post Facto Clause.

## UNDISPUTED FACTS

In September 1986 in Davidson County, Tennessee, Plaintiff, Carl Jordan, was convicted of murder, aggravated rape, and armed robbery. (Jordan Dep. 25:20-26:19; Ex. 2 Plaintiff's Resp. Interrog.) He was released from prison in 2005. (Jordan Dep. 24:20-24.) Upon his release in

2005, Plaintiff registered on Tennessee's sex offender registry, and he remained registered until August 2020. (Jordan Dep. 22:13-25:5.)[1]

Because of his offense, Plaintiff is classified as a violent sexual offender, requiring him to be registered for life and to report to law enforcement on a quarterly basis. *See* Tenn. Code Ann. §§ 40-39-204(b)(1), 40-39-207(g)(2). While Plaintiff was on the registry, the local registering authorities visited his residence periodically. (Jordan Dep. 51:2-53.) These visits were the result of the policies of the registering agency, Defendant Metropolitan Government of Nashville, and not a requirement imposed by the Act. (Elliott Dep. 62:2-63:18; Metro Gov't 30(b)(6) Dep. 15:17-17:3; 41:24-52:19, 77:15-81:22; Exhibit 8 to Metro Gov't 30(b)(6) Dep.)

## PROCEDURAL BACKGROUND

On October 15, 2019, Plaintiff filed the complaint that initiated this litigation. (D.E. 1.) Plaintiff has since filed an Amended Complaint in which he challenges the constitutionality of the Act under the Ex Post Facto Clause and seeks relief pursuant to 42 U.S.C. § 1983. (D.E. 10.) With respect to the State Defendants, Plaintiff asks that the Court declare the Act unconstitutional as applied to him and enjoin the State Defendants from enforcing it against him. (*Id.* at 54.)

The Court denied the State Defendants' motion to dismiss and granted Plaintiff preliminary injunctive relief on August 12, 2020, requiring the State Defendants not to enforce the Act against Plaintiff. (D.E. 40.) The State Defendants subsequently filed an Answer; discovery followed, and this case was set for trial. (D.E. 41, 45, 46.) The discovery period has ended, and the State Defendants now move for summary judgment.

---

[1] Plaintiff was removed from the registry in August 2020 by virtue of the preliminary injunction issued by this Court in August 2020, as noted below.

2

## LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is appropriate where the pleadings and admissions on file demonstrate that "there is no genuine dispute as to any material fact" and that "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *F.P. Dev., LLC v. Charter Twp. of Canton, Michigan*, 16 F.4th 198, 203 (6th Cir. 2021). The main inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Wilson v. Gregory*, 3 F.4th 844, 855 (6th Cir. 2021) (quoting *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 481 (6th Cir. 2020)). "At the summary-judgment stage, 'the evidence is construed and all reasonable inferences are drawn in favor of the nonmoving party.'" *Clemons v. Couch*, 3 F.4th 897, 902 (6th Cir. 2021) (quoting *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013)).

To avoid a motion for summary judgment, the "nonmoving party 'must set forth specific facts showing that there is a genuine issue for trial.'" *RJ Control Consultants, Inc. v. Multiject, LLC*, 981 F.3d 446, 452 (6th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). But the "'mere existence of a scintilla of evidence' in support of the non-moving party does not establish a genuine issue of material fact." *Goodman v. J.P. Morgan Inv. Mgmt., Inc.*, 954 F.3d 852, 859 (6th Cir. 2020) (quoting *Anderson*, 477 U.S. at 252). The evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Clemons*, 3 F.4th at 902 (quoting *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018)). Therefore, summary judgment is warranted if "non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden

3

of proof at trial." *Goodman*, 954 F.3d at 859 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

The State Defendants are entitled to judgment as matter of law because Plaintiff cannot carry his burden of proof to show that applying the Act to him amounts to retroactive punishment and therefore violates the Ex Post Facto Clause.

The Constitution provides that "No State shall . . . pass any . . . ex post facto Law." U.S. Const. art. I, § 10, cl. 1. The Ex Post Facto Clause prohibits state legislatures from enacting a law that "imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." *Weaver v. Graham*, 450 U.S. 24, 28 (1981) (quoting *Cummings v. Missouri*, 71 U.S. 277, 326 (1866)). The clause "does not bar *all* retroactive lawmaking, but only retroactive punishment." *Does #1-5 v. Snyder*, 834 F.3d 696, 699 (6th Cir. 2016).

Courts employ a two-part intent-effects analysis to determine whether a law inflicts retroactive punishment. First, "[a] court must ascertain whether the legislature intended the statute to establish civil proceedings." *Seling v. Young*, 531 U.S. 250, 261 (2001).

Second, a court will accept a state legislature's intention to establish civil proceedings unless the challenging party provides the "clearest proof," "by reference to a variety of factors, 'considered in relation to the statute on its face,'" that a statute is punitive in effect. *Id*. at 261-62 (quoting *Hudson v. United States*, 522 U.S. 93, 100 (1997)). To meet this burden of proof, the challenging party should provide evidence about the general effect of a law, including "first, the severity of the law's restrictions as applied in the real world and, second, the evidence, or lack thereof, of the registration system's efficacy." *Jordan v. Lee*, No. 3:19-cv-00907, 2020 WL

4

4676477, *18 (M.D. Tenn., Aug. 12, 2020). Facts about individualized effects are not a proper basis for finding an ex post facto violation. *See Seling*, 531 U.S. at 262 ("[T]his Court expressly disapproved of evaluating the civil nature of an Act by reference to the effect that Act has on a single individual."); *Does #1-9 v. Lee*, No. 3:21-CV-00590, 2021 WL 5761039, at *3 (M.D. Tenn. Dec. 3, 2021). Such facts may, however, serve to illustrate how a law is applied. *See Snyder*, 834 F.3d at 702-06 (considering facts about individual offenders as illustrative but relying on facts about the general effect of a law when determining whether it violated the Ex Post Facto Clause).

On this second part of the intent-effects analysis, courts consider the following factors:

(1) Does the law inflict what has been regarded in our history and traditions as punishment?
(2) Does it impose an affirmative disability or restraint?
(3) Does it promote the traditional aims of punishment?
(4) Does it have a rational connection to a non-punitive purpose?
(5) Is it excessive with respect to this purpose?

*Snyder*, 834 F.3d at 701 (citing *Smith v. Doe*, 538 U.S. 84, 97 (2003)). "This is a challenging standard for plaintiffs." *Hope v. Commissioner of Indiana Dept. of Correction*, 9 F.4th 513, 530 (7th Cir. 2021) (en banc).

Under the first step of the intent-effects analysis, it is clear, as stated in the Act, that it was the intent of the Tennessee legislature to establish a civil proceeding when it enacted the Act. *See* Tenn. Code Ann. § 40-39-201(b)(8) ("The general assembly also declares, however, that in making information about certain offenders available to the public, the general assembly does not intend that the information be used to inflict retribution or additional punishment on those offenders."); *see also Jackson v. Rausch*, No. 3:19-CV-377, 2021 WL 4302769, at *5 (E.D. Tenn. Sept. 21, 2021) ("The plain language of this statute expresses a nonpunitive intent to protect the public." (quoting *Ward v. State*, 315 S.W.3d 461, 470 (Tenn. 2010))).

5

Turning to the second step, Plaintiff contends that the Act has an unconstitutionally punitive effect as applied to him. (D.E. 10, PageID# 53.) Plaintiff relies heavily for this contention on the Sixth Circuit decision in *Does #1-5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016). (D.E. 26, PageID# 94.) The State Defendants maintain that *Snyder* was wrongly decided. Regardless, though, *Snyder* is not controlling on the issues presented here. *Snyder* held, based on the record developed in that case, only that *Michigan*'s Sex Offender Registration Act imposed punishment and that, as a result, its retroactive application was unconstitutional. 834 F.3d at 705-06. The record in this case differs from *Snyder*, and because the ex post facto analysis is, in part, "fact-intensive," the record in this case alone should be determinative. *Jordan*, 2020 WL 4676477, at *18; *see also Hope*, 9 F.4th at 534 ("The plaintiffs have not carried their heavy burden of proving that SORA is so punitive in effect as to override the Indiana legislature's intent to enact a civil law."). Based on the record in this case, as discussed below, Plaintiff cannot sufficiently demonstrate by the clearest proof that application of the Act to him is "so punitive in either purpose or effect as to negate the State's intention." *Seling*, 531 U.S. at 261.

**I.   The Act Does Not Impose What Has Been Regarded in Our History and Traditions as Punishment.**

The Act does not inflict punishment as understood in our history and traditions. When evaluating whether a law amounts to punishment, courts ask whether the law in question resembles banishment, shaming, and probation or parole. *Hope*, 9 F.4th at 531. These traditional hallmarks of punishment are distinguishable from the civil regulations of the Act. And the evidence in the record also fails to show that, when applied to sexual offenders across Tennessee, the Act resembles banishment, shaming, and probation or parole.

### A. The Act's restrictions are not equivalent to banishment.

The Act's restrictions are markedly different from the traditional punishment of banishment. Banishment historically "involved the complete expulsion of an offender from a socio-political community" and "prohibited an offender from even being present in the jurisdiction." *Shaw v. Patton*, 823 F.3d 556, 566 (10th Cir. 2016). "Under the historic common law, banishment is equated to deportation." Beth Caldwell, *Banished for Life: Deportation of Juvenile Offenders as Cruel and Unusual Punishment*, 34 Cardozo L. Rev. 2261, 2302 (2013). Banishment completely removes an individual from a geographical area, and "the banished individual presumably retains *no* rights of membership in the community from which he/she was banished." William Garth Snider, *Banishment: The History of Its Use and a Proposal for its Abolition Under the First Amendment*, 24 New Eng. J. on Crim. & Civ. Confinement 455, 476 (1998). Blackstone described banishment as a "civil death," rendering the banished "absolutely dead in law" and "entirely cut off from society" the same way that a monk relinquishes his life upon entering a monastery. 1 William Blackstone, *Commentaries* 128. Thus, restrictions on sexual offenders that affect where an offender may live or work "do not amount to banishment" because they do not prevent offenders from either "return[ing] to their original community [or] . . . be[ing] admitted easily into a new one.'" *Hope*, 9 F.4th at 531 (quoting *Vasquez v. Foxx*, 895 F.3d 515, 521 (7th Cir. 2018)).

The restrictions in the Act do not cut sexual offenders off from society or deport them from the State. The Act curtails residence and employment only in specific locations within the State. Tenn. Code Ann. § 40-39-211(a)(1) (restricting sexual offenders from knowingly living or accepting employment within one thousand feet of a protected area). And the Act prevents sexual offenders from visiting or approaching certain protected areas when children are present. Tenn.

7

Code Ann. § 40-39-211(d)(1). It neither prohibits offenders from living in the State nor from living in any particular county. Nor does the Act prohibit offenders from engaging with the community.

While banishment would result in immediate expulsion from a home, leaving the estate to the heirs of the banished, 1 William Blackstone, *Commentaries* 128, the Act allows offenders to maintain their residence and employment, even if changes in the use of surrounding property would normally prohibit the offender from establishing a residence or employment at that location. Tenn. Code Ann. § 40-39-211(e). Rather than imposing "civil death" and complete expulsion from society, 1 William Blackstone, *Commentaries* 128, the Act imposes reasonable residency and employment restrictions to protect vulnerable populations and limit opportunities for recidivism. *See Hope*, 9 F.4th at 531 (holding 1,000-foot residency restriction is not similar to banishment). Thus, restrictions in the Act do not amount to banishment.

Nor do the facts in the record show that, in effect, the Act expels sexual offenders from the socio-political community of the State. In *Snyder*, the Sixth Circuit found that sexual offenders were burdened by Michigan's sex offender registration laws "especially in densely populated areas." *Snyder*, 834 at 701. Relying on a map prepared by an expert witness, the Court found that plaintiffs in Grand Rapids, Michigan, were banished from school zones under Michigan's law. *Id.* at 702.

Unlike the *Snyder* plaintiffs, Plaintiff here has not submitted a map prepared for this case by an expert witness. The record therefore lacks sufficient evidence to support a finding that the Act subjects sexual offenders in Tennessee to banishment. *See Jackson*, 2021 WL 4302769, at *7 ("Plaintiff has not shown that the Act has placed restrictions equivalent to banishment as applied

to him."). For these reasons, Plaintiff cannot carry his burden to demonstrate by the clearest proof that the restrictions in the Act amount to banishment.

> **B.    Public identification of offenders as "violent" is not equivalent to public shaming.**

The Act's publication of vital information to the public is distinct from the historic punishment of public shaming. There were colonial punishments intended "to inflict public disgrace" and make offenders "suffer permanent stigmas, which in effect cast the person out of the community." *Smith*, 538 U.S. at 97-98 (quotation marks and citations omitted). But "[a]ny initial resemblance" of the Act to such punishments is "misleading." *Id*. at 98. Those historical punishments of public shaming "held the person up before his fellow citizens for face-to-face shaming." *Id*. The Act neither promotes face-to-face confrontations between the public and offenders nor seeks to humiliate the offender. In fact, every citizen who accesses the registry is informed that, by law, the information may not be used to inflict retribution on, harass, or threaten offenders. Tenn. Code Ann. § 40-39-201(8); Tenn. Bureau of Investigation, *Sex Offender Registry Search*, https://www.tn.gov/tbi/general-information/redirect-tennessee-sex-offender-registry-search/sex-offender-registry-search.html (last visited February 3, 2022). Instead of promoting "face-to-face shaming," the Act discourages confrontation and promotes public awareness. *Smith*, 538 U.S. at 98; *see Doe v. Settle*, No. 20-1951, 2022 WL 260866, at *13 (4th Cir. Jan. 28, 2022) (finding the publication of a sexual offender's profile online did not resemble shaming because generally shaming "involved physical pain and direct confrontation with the community"). Any stigma resulting from publicly designating a person convicted of rape as a violent sexual offender "results not from public display for ridicule and shaming but from the dissemination of accurate information about a criminal record, most of which is already public." *Smith*, 538 U.S. at 98; *see id*. at 98-99 (stating that publication on the Internet "does not alter [the] conclusion" that

9

"dissemination of truthful information in furtherance of a legitimate governmental objective" is not punishment); *see also Hope*, 9 F.4th at 531 (finding that applying "categorical labels" to offenders like "'sexually violent offender' or 'offender against children' . . . . falls short of public shaming" because these labels "transmit[] accurate information about the underlying conviction").

Nor does the record in this case show that the Act publicly shames sexual offenders in Tennessee. Indeed, there is no evidence that the Act requires registered sexual offenders in Tennessee to undergo face-to-face confrontations with the public designed to humiliate offenders. Consequently, Plaintiff cannot show by the clearest proof that the Act sanctions and facilitates shaming.

### C. Reporting requirements are not equivalent to probation or parole.

The traditional punishments of probation and parole are different from the Act's reporting requirements in both character and effect. Historically, probation and parole have involved far more comprehensive governmental intrusions into a probationer's affairs than the Act's reporting requirements.

The Act requires offenders to report either annually or quarterly, depending on offender classification, as well as any time offenders change their reportable information. Tenn. Code Ann. §§ 40-39-203, -204. In contrast, probationers are traditionally subject to the active supervision of a probation officer. *Shaw*, 823 F.3d at 564; *see Smith*, 538 U.S. at 87 (noting that registrants, unlike probationers, have "no supervision" and "are not required to seek permission" before engaging in activities); Tenn. Code Ann. § 40-28-117(a)(1) (specifying that parolees "remain while thus on parole in the legal custody of the warden of the prison . . . until the expiration of parole"). The conditions of probation typically require probationers to accept the first offer of employment; obtain written consent from a probation officer before moving or changing jobs;

10

meet family responsibilities; report monthly to the probation office; "avoid[] all evil associations," including abstaining from drugs and alcohol; submit to searches of person and property on no more than reasonable suspicion of a probation violation or criminal activity; submit to random drug tests; permit state agents to visit their homes; perform community service; undergo medical or psychiatric treatment; go on house arrest; use a transdermal monitoring device; make restitution to a victim; and sometimes serve time in a county jail. *Shaw*, 823 F.3d at 565 & n.14 (quoting Lawrence M. Friedman, *Crime and Punishment in American History* 408 (1993)); *State v. Petersen-Beard*, 377 P.3d 1127, 1137 (Kan. 2016); *State v. Price*, 579 S.W.3d 332, 339-40 (Tenn. 2019) (listing the many conditions of probation); Tenn. Code Ann. §§ 40-28-117(a)(2), 40-35-303(d).

The Act requires none of these things. It does not require offenders to be employed. It does not require consent of law enforcement as a condition precedent to offenders moving or changing employment. *See* Tenn. Code Ann. § 40-39-211 (restricting offenders from living or working in protected areas but not requiring prior approval of the housing or employment situation). It does not regulate the offenders' responsibility to their families. *Id.* It does not require monthly reports. Tenn. Code Ann. § 40-39-203 (requiring violent sexual offenders to report only on a quarterly basis or within a specified time if certain information in the offenders' profiles changes). It does not restrict who an offender may befriend or what an offender may imbibe. It does not require offenders to submit to searches of person or property based on a reasonable suspicion; it does not even contain the word "search." Tenn. Code Ann. §§ 40-39-201 to -118. It does not require random drug tests, home visits, community service, medical or psychiatric treatment, transdermal monitoring devices, or restitution.

11

And while the Act is enforceable through criminal penalties, those penalties are a consequence distinct from a sexual offender's original offense—unlike the possibility that parole or probation may be revoked, which is tied to the underlying criminal punishment. *Smith*, 538 U.S. at 101-02 ("A sex offender who fails to comply with the reporting requirement may be subjected to criminal prosecution for that failure, but any prosecution [for violating a sex offender registry statute] is a proceeding separate from the individual's original offense."); *Hope*, 9 F.4th at 532; *Shaw*, 823 F.3d at 566. In short, the Act does not impose the typical supervisory conditions that permeate every aspect of a probationer's or parolee's life. The record lacks facts showing anything to the contrary.

For all these reasons, Plaintiff cannot establish by the clearest proof that the Act imposes what has been historically regarded as punishment.

## II.    The Act Does Not Impose an Affirmative Disability or Restraint.

As to the second of the five ex post facto factors, the Act does not impose affirmative disabilities or restraints of a punitive nature. When weighing this factor in *Smith*, the Supreme Court found that the registration requirements in Alaska's sex offender act "make a valid regulatory program effective and do not impose punitive restraints in violation of the Ex Post Facto Clause." *Id*. at 102. Emphasizing that a statute's resemblance to imprisonment is particularly important, the Court observed:

> The Act imposes no physical restraint, and so does not resemble the punishment of imprisonment, which is the paradigmatic affirmative disability or restraint. The Act's obligations are less harsh than the sanctions of occupational debarment, which we have held to be nonpunitive. The Act does not restrain activities sex offenders may pursue but leaves them free to change jobs or residences.

*Id.* at 100 (citations omitted). So too here: the annual and quarterly registration requirements in Tennessee's Act are key to the efficacy of the regulatory scheme because they keep information

in the registry up-to-date, and they do not resemble imprisonment. *See* Tenn. Code Ann. § 40-39-204.

Even onerous burdens—including fines, occupational disbarment, involuntary confinement, and denial of governmental benefits—will not transform a civil regulation into punishment. *See Hope*, 9 F.4th at 532-33 (collecting Supreme Court cases). The 1,000-foot restrictions imposed by Tennessee's Act are not physical restraints or obligations so onerous that they approach imprisonment. *See id.* (holding a similar 1,000-foot restriction did not impose an affirmative disability or restraint); *Vasquez*, 895 F.3d at 522 (upholding similar 500-foot restrictions); *Shaw*, 823 F.3d at 568, 570-71 (upholding similar 2,000-foot restrictions).

The facts in the record do not show otherwise—there are not facts showing that the Act generally imposes affirmative disability or restraint on sexual offenders. This is a crucial shortcoming of Plaintiff's case. *See Smith*, 538 U.S. at 100 ("The record in this case contains no evidence that the Act has led to substantial occupational or housing disadvantages for former sex offenders that would not have otherwise occurred through the use of routine background checks by employers and landlords."). In the absence of such facts, Plaintiff cannot carry his burden of "clearest proof."

### III. The Act Does Not Promote the Traditional Aims of Punishment.

Regarding the third factor, the Act is designed to promote the legislature's civil regulatory interest in public safety. Any collateral effects that may resemble the aims of punishment are not sufficient to deem it punitive in effect. Criminal punishment has traditionally been founded on retribution, but it may also be expected to deter future crime, rehabilitate criminals, and, in some cases, incapacitate criminals. *Ewing v. California*, 538 U.S. 11, 25 (2003).

The Tennessee General Assembly has articulated eight non-punitive purposes for the Act, including to protect the public, to enhance public scrutiny of the criminal and mental health systems, and to benefit the general welfare of Tennesseans. Tenn. Code Ann. § 40-39-201(b)(1)-(8). The obvious aim of the Act is therefore to promote public safety by protecting and informing Tennesseans. Tenn. Code Ann. § 40-39-201. While the Act may have a collateral deterrent effect on crime, such collateral effects will not render sex offender registration laws punitive. *Smith*, 538 U.S. at 102; *see also Snyder*, 834 F.3d at 704 (giving "this factor little weight" because of the overlap between civil and punitive purposes). The Act's collateral deterrent effects do not make it punitive, and Plaintiff cannot present evidence to show otherwise.

### IV. The Act Has a Rational Connection to its Non-Punitive Purpose.

With respect to the fourth factor, the Act is rationally related to the State's non-punitive interest in public safety. This factor is "[m]ost significant" to this Court's determination of whether the Act is punitive. *Smith*, 538 U.S. at 102 (quoting *United States v. Ursery*, 518 U.S. 267, 290 (1996)).[2] The Supreme Court has held that sex offender registration laws are rationally connected to the State's interest in public safety. *Smith*, 538 U.S. at 102-03. And multiple other courts have held that sex offender registration acts are rationally related to the governmental interest in public safety. *See*, *e.g.*, *Hope*, 9 F.4th at 533-34; *Shaw*, 823 F.3d at 573-75.

Tennessee's Act reflects, on its face, a rational connection to the Act's non-punitive purpose. The Tennessee General Assembly has found that violent sexual offenders "present an

---

[2] This Court has previously assumed that the defending public official bears the burden of proof on this factor because the defending public official would bear the burden of proof in an as-applied First Amendment challenge. *Doe #1 v. Lee*, 518 F. Supp. 3d 1157, 1202 (M.D. Tenn. 2021). But due to the quasi-facial nature of an as-applied ex post facto challenge like this one, the party challenging the statute bears the burden of proof. *See Seling*, 531 U.S. at 261. This burden does not shift for factor four. *See id.*

14

extreme threat to public safety" and that "[s]exual offenders pose a high risk of engaging in further offenses." Tenn. Code Ann. § 40-39-201(b)(1). "[P]rotection of the public from these offenders is of paramount public interest," and it is necessary that the public have information about offenders "to adequately protect themselves and their children from these persons." Tenn. Code Ann. § 40-39-201(b)(1) – (2). The Supreme Court, the Sixth Circuit, and other courts have recognized that it is a legislature's prerogative to conclude that sexual offenders pose a risk to public safety. *Smith*, 538 U.S. at 103; *Hope*, 9 F.4th at 534; *Shaw*, 823 F.3d at 575-77; *Doe v. Bredesen*, 507 F.3d 998, 1007 (6th Cir. 2007) ("[O]ur role is not to invalidate the program if the Tennessee Legislature has not struck the perfect balance between the regulatory purpose of the program and its burdens on Tennessee citizens . . . ."); *Petersen-Beard*, 377 P.3d at 1139-40.

Furthermore, "[a] statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance." *Smith*, 538 U.S. at 103. Instead, there must be proof "that the Act's nonpunitive purpose is a 'sham or mere pretext.'" *Id*. (quoting *Kansas v. Hendricks*, 521 U.S. 346, 371 (1997) (Kennedy, J., concurring)). The record in this case contains no such evidence. Because Plaintiff cannot, as he must, demonstrate by "the clearest proof" that Tennessee's interest in public safety is a sham or pretext, this factor must also be counted against him. *See Seling*, 531 U.S. at 261.

## V.     The Act Is Not Excessive with Respect to Its Non-Punitive Purpose.

The Act imposes reasonable reporting requirements, offender classifications, and protected-area restrictions to serve the legislature's interest in public safety; it is not excessive in relation to its non-punitive purpose. "The excessiveness inquiry of our *ex post facto* jurisprudence is not an exercise in determining whether the legislature has made the best choice possible to

15

address the problem it seeks to remedy. The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective." *Smith*, 538 U.S. at 105.

The burden that sexual offenses impose on the public should not be underestimated. Even considering only the monetary aspect of this burden, the costs of sexual offenses are staggeringly high. Medical expenses for sexual assaults in the United States cost approximately $473,060,000.00 in 2019 alone. *See* Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, *WISQARS: Cost of Injury Data*, https://wisqars.cdc.gov/cost/?y=2019&o=HOSP&i=4&m=3000&g=00&s=1&s=2&s=3&u=TOTAL&u=AVG&t=COMBO&t=MED&t=LIFE&t=WORK&a=5Yr&g1=0&g2=199&a1=0&a2=199&r1=MECH&r2=INTENT&c1=NONE&c2=NONE (last accessed January 31, 2022).[3] A 2017 study found that "[t]he present-value, per-victim estimated lifetime cost of rape was $122,461, or $3.1 trillion for all victims, based . . . on 23 million U.S. women and 2 million men with . . . . lifetime experience of rape" and that "[g]overnment sources pay an estimated $1 trillion (32%) of the total lifetime economic burden" of rape. Cora Peterson, Sarah DeGue, Curtis Florence, & Colby N. Lokey, *Lifetime Economic Burden of Rape Among U.S. Adults*, Am J Prev Med. 52(6):691-701 (June 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5438753/pdf/nihms849041.pdf; *see also* Centers for Disease Control and Prevention, *WISQARS: Cost of Injury Data* (estimating a loss of quality of life costing $547,470,000 for victims of sexual assault in 2019). The State has an intense interest in mitigating the economic and noneconomic costs of such crimes.

---

[3] "The Court can take judicial notice of government statistics." *Victoria Cruises, Inc. v. Changjiang Cruise Overseas Travel Co.*, 630 F. Supp. 2d 255, 263 n.3 (E.D.N.Y. 2008); *see also* Fed. R. Evid. 201; *United States v. Esquivel*, 88 F.3d 722, 726-27 (9th Cir. 1996) (taking judicial notice of census data compiled by the United States Department of Commerce).

Due to the State's interest, the Act's housing and employment restrictions and its provisions designed to maintain distance between offenders and certain protected public areas are reasonable. As shown in the chart below, data from the Department of Justice Bureau of Justice Statistics reflects that, in 2019, children in Tennessee "ages 14 to 17 experienced the highest rate of sexual assault victimization, compared to other age groups"—at "a rate 4 times the overall rate for Tennessee"—and that many of the protected areas in the Act, including schools, daycares, and outdoor public locations fall within the categories accounting for the vast majority of locations of sexual assaults in Tennessee not committed in a home or a hotel. U.S. Department of Justice, Bureau of Justice Statistics, *Sexual Assaults Recorded by Law Enforcement, 2019*, at 11, 13 (July 2021) https://bjs.ojp.gov/sites/g/files/xyckuh236/files/sarble/sarble19/data/pdfs/sarble19_TN.pdf (last accessed January 31, 2022).



The regulations imposed by the Act are reasonable in light of the threat to public safety and welfare posed by sexual offenders. And Plaintiff has not presented evidence to show that the effect of the Act on sexual offenders is excessive with respect to its non-punitive purpose.

Considering all five factors, then, Plaintiff cannot carry his burden of proof. The record in this case does not show that the Act is so punitive in effect as to negate the legislature's intent to enact a civil law, compelling a conclusion that the Act does not impose retroactive punishment.

## CONCLUSION

For these reasons, the motion for summary judgment of Defendants Lee and Rausch should be granted.

Respectfully submitted,

HERBERT H. SLATERY III
Attorney General and Reporter

s/ Rob Mitchell
ROB MITCHELL (32266)
Senior Assistant Attorney General

s/ Miranda Jones
MIRANDA JONES (36070)
Assistant Attorney General

Law Enforcement and
Special Prosecutions
Division
Office of the Tennessee
Attorney General and
Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
Off. (615) 532-6023
Fax (615) 532-4892
robert.mitchell@ag.tn.gov
miranda.jones@ag.tn.gov
*Counsel for Defendants Lee and Rausch*

**CERTIFICATE OF SERVICE**

      I hereby certify that a true and correct copy of the foregoing has been filed and served by the Court's electronic filing system upon:

Kyle Mothershead
2901 Dobbs Ave.
Nashville, TN 37211
T: (615) 982-8002
F: (615) 229-6387
kyle@relentlesslaw.com
*Counsel for Plaintiff*

J. Brooks Fox
Michael R. Dohn
Assistant Metropolitan Attorneys
Metropolitan Courthouse, Suite 108
P.O. Box 196300
Nashville, Tennessee 37219
(615) 862-6341
brook.fox@nashville.gov
michael.dohn@nashville.gov
*Counsel for Metropolitan Government of Nashville/Davidson County, Tennessee*

On this the 28th day of February, 2022.

                                                    s/ Rob Mitchell
                                                  ROB MITCHELL

19

Case 3:19-cv-00907   Document 56   Filed 02/28/22   Page 19 of 19 PageID #: 1154