# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| CARL E. JORDAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:19-cv-00907 |
| | ) | Judge Aleta A. Trauger |
| WILLIAM LEE, Governor of the State | ) | |
| of Tennessee; DAVID RAUSCH, Director of | ) | |
| the Tennessee Bureau of Investigation; | ) | |
| and METROPOLITANGOVERNMENT | ) | |
| OF NASHVILLE-DAVIDSON COUNTY, | ) | |
| TENNESSEE, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

Three motions for summary judgment are pending in this case. Carl E. Jordan has filed a Motion for Summary Judgment as to Liability (Doc. No. 49), to which Governor William Lee and Tennessee Bureau of Investigation ("TBI") Director David Rausch and the Metropolitan Government of Nashville and Davidson County ("Metro") have filed Responses (Doc. Nos. 58, 60). Metro has filed a Motion for Summary Judgment (Doc. No. 52), to which Jordan has filed a Response (Doc. No. 62), and Metro has filed a Reply (Doc. No. 66). Finally, the Governor and Director have filed a Motion for Summary Judgment (Doc. No. 55), which Jordan also addresses in the aforementioned Response (Doc. No. 62), and the Governor and Director have filed a Reply (Doc. No. 65). For the reasons set out herein, the court will grant Jordan's motion and deny the defendants' motions.

## A. The Constitutional Prohibition on *Ex Post* Facto Punishments

The United States Constitution presupposes that the government may punish people for actions that have been deemed criminal. However, the government's authority to impose criminal punishment is subject to certain special constraints that may not apply to the government's other powers. One such constraint is the Constitution's ban on the adoption of "ex post facto Laws," set out in its *Ex Post Facto* Clauses, one of which applies to the federal government and one to the states. U.S. Const., art I, §§ 9, cl.3, 10, cl. 1.[2]

"[E]x post facto law" is "a term of art" that, consistently with its "established meaning at the time of the framing," has been construed to refer to criminal, but not civil, laws that are retroactive in effect. *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 504 (1995) (quoting *Collins v. Youngblood*, 497 U.S. 37, 43 (1990)). *But see Collins*, 497 U.S. at 41 (acknowledging that a literal reading of the language would reach all, not merely criminal, laws). In its most straightforward formulation, the *Ex Post Facto* Clause dictates that "[l]egislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts." *Collins*, 497 U.S. at 43. "Through this prohibition, the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." *Weaver v. Graham*, 450 U.S. 24, 28–29 (1981) (citing *Dobbert v. Florida*, 432 U.S.

---

[1] A substantial portion of this opinion reiterates background and analysis that the court set forth in its August 12, 2020 opinion addressing Jordan's request for a preliminary injunction and the defendants' motions to dismiss. (Doc. No. 39.) The court's conclusions, however, reflect an application of the governing law to the particular evidence and arguments presented in the context of the motions for summary judgment.

[2] Because this case involves actions by the State of Tennessee, the court will refer to the state Clause, U.S. Const., art I, § 10, cl. 1, as "the *Ex Post Facto* Clause."

282, 298 (1977); *Kring v. Missouri*, 107 U.S. 221, 229 (1883); *Calder v. Bull*, 3 U.S. 386, 387 (1798)).

The *Ex Post Facto* Clause, on its face, contains no exceptions and makes no reference to the severity of either the crime committed or the punishment at issue. That is because the core interest protected by the Clause "is not an individual's right to less punishment," but rather the "lack of fair notice" given by the government. *Weaver*, 450 U.S. at 30. Accordingly, even a scrupulously proportionate punishment can violate the *Ex Post Facto* Clause if it was not authorized at the time that the underlying wrongful act was committed, and even a manifestly unjust and disproportionate punishment will not violate the Clause, as long as that punishment was authorized ahead of time. The *Ex Post Facto* Clause is concerned with timing and notice, not reasonableness in a larger sense.

While the core prohibition of the *Ex Post Facto* Clause is straightforward, courts have long struggled with its outer boundaries. For example, it is accepted as axiomatic that the Clause "forbids the application of any new punitive measure to a crime already consummated, to the detriment or material disadvantage of the wrongdoer." *Lindsey v. Washington*, 301 U.S. 397, 401 (1937) (citing *Kring*, 107 U.S. at 228–29; *Thompson v. Utah*, 170 U.S. 343, 351 (1898); *In re Medley*, 134 U.S. 160, 171 (1890)). Accordingly, a state could not retroactively turn a crime with a ten-year minimum sentence into one with a twenty-year minimum sentence. The actual practice of criminal punishment, however, involves more than merely imposing a sentence dictated by statute. The punishment that a convicted defendant will actually receive involves an array of judicial and administrative determinations, including the selection of a sentence from a range of possible options, the calculation of actual days to serve, the availability of "good time" or other post-conviction reductions in time to serve, and, of course, the availability of parole and the

3

procedures that govern parole determinations. Faced with changes in these secondary determinants of a defendant's punishment, the Supreme Court's "cases 'have not attempted to precisely delimit the scope of'" the term "*ex post facto* Law," "but have instead given it substance by an accretion of case law." *Peugh v. United States*, 569 U.S. 530, 538–39 (2013) (quoting *Dobbert*, 432 U.S. at 292); *see, e.g.*, *id.* at 544 (holding that retroactive application of change in Sentencing Guidelines violated the *Ex Post Facto* Clause); *Lynce v. Mathis*, 519 U.S. 433, 446 (1997) (holding that retroactive cancellation of provisional early release credits violated the *Ex Post Facto* Clause); *Morales*, 514 U.S. at 514 (holding that retroactive application of law allowing for deferral of parole hearings did not violate the *Ex Post Facto* Clause); *Weaver*, 450 U.S. at 36 (holding that retroactive application of statute reducing availability of good time credits violated the *Ex Post Facto* Clause).

## B. Tennessee's Sexual Offender Registry and Restrictions on Registrants

Prior to 1994, individuals in Tennessee convicted of sexual offenses faced formal consequences that were mostly similar to those borne by individuals convicted of similarly serious non-sexual offenses. There may have been unique collateral consequences for sexual offenses in some areas—such as in family law proceedings—and defendants convicted of sexual crimes may have suffered especially severe extralegal reputational harms in their communities. For the most part, however, the path of a person convicted of a sexual offense was a familiar one: he[3] would be convicted and serve punishment, often in the form of incarceration, after which he might be paroled or, if not paroled, released when his sentence was completed. Then, if there were no other sentences or charges awaiting him related to other crimes, he would attempt to reintegrate into society.

---

[3] Of course, sexual offenses are committed by women as well as men. The court will use "he" because the offender at issue in this case, Jordan, is a man and because it likely reflects the significant majority of offenders.

4

In 1994, however, the Tennessee General Assembly, concerned with the potential actions of sexual offenders after they had served their sentences, adopted legislation requiring the TBI to "establish, maintain, and update a centralized record system of sexual offender registration and verification information." 1994 Tenn. Pub. Laws, ch. 976 § 7(a). The law required registration for all individuals convicted of any one of a number of identified sexual offenses, "unless the offender had been wholly released without supervision from incarceration, probation, or parole prior to January 1, 1995." *Doe v. Haslam*, No. 3:16-CV-02862, 2017 WL 5187117, at *1 (M.D. Tenn. Nov. 9, 2017) (Crenshaw, C.J.) (citing 1994 Tenn. Pub. Laws, ch. 976 § 3(2)–(3)). Accordingly, there existed a subset of defendants who were required to register based on crimes they committed before the registry was in place: namely, (1) convicted defendants who were still in the process of incarceration, parole, or supervision for a crime committed prior to 1995; and (2) individuals who committed crimes prior to 1995 but would only go on to be convicted at a later date.

The initial registration system was relatively undemanding and mostly concerned with ensuring the accuracy of registry information. A person convicted of a covered offense was required to register with the TBI by paper form within ten days of release without supervision from probation, parole, or incarceration. 1994 Tenn. Pub. Laws, ch. 976 § 4. The TBI would then send the registrant a fresh verification form every ninety days, which the registrant was required to return within ten days of receipt. *Id.* § 5. The registrant also had an ongoing duty to complete a new form within ten days of any change of residence. *Id.* § 4. The information in the registry was generally considered confidential, but the TBI or a local law enforcement agency could "release relevant information deemed necessary to protect the public concerning a specific sexual offender." *Id.* § 7(c). After ten years, a registrant could petition a court to order his removal from

the registry, which the court would grant if it found the registrant had complied with the Act, was rehabilitated, and did not pose a threat to public safety. *Id.* § 8. There were no restrictions on where a registrant could live, work, or travel. *Doe*, 2017 WL 5187117 at *2.

In the ensuing decades, however, the Tennessee General Assembly repeatedly returned to the sexual offender registration statutes to change whom they reached, what they required, and how much protection (or lack thereof) they offered to registered offenders' privacy. Chief Judge Crenshaw of this district has recounted the statutes' long history of more than two dozen revisions in *Doe v. Haslam*, No. 3:16-CV-02862, 2017 WL 5187117, at *1 (M.D. Tenn. Nov. 9, 2017), and reference will be made to that opinion for the details. In short, Tennessee's sexual offender registration system progressed from a relatively simple system, dedicated to information gathering and tracking, into a far-reaching structure for regulating the conduct and lifestyles of registered sexual offenders after their punishments were complete and, in many cases, for the rest of their lives. The court will briefly summarize some of the key provisions in their current form.

1. Initial Eligibility and Levels of Offender

The current registration statute, the Tennessee Sexual Offender and Violent Sexual Offender Registration, Verification, and Tracking Act ("Act"), dictates that individuals convicted of certain enumerated offenses must register with law enforcement for inclusion in a database maintained by the TBI. Offenses that require registration are mostly ones that, on their face, contain a sexual element, such as serial indecent exposure, aggravated rape, and rape of a child.[4] Tenn. Code Ann. § 40-39-202(20)(A)(vii), (31)(A), (D).

---

[4] It is possible, however, to qualify for registration based on the kidnapping of a child other than one's own, without any additional sexual component. Tenn. Code Ann. § 40-39-202(20)(a)(vi).

6

The Act divides registrants into "sexual offenders" and "violent sexual offenders," based primarily on the particular offense of which the person was convicted.[5] The term "violent sexual offenders" encompasses not only "sexual offenders who use physical violence" but also "[r]epeat sexual offenders" and "sexual offenders who prey on children." Tenn. Code Ann. §§ 40-39-201(b)(1), 40-39-202(20), (30)–(31). A (non-violent) sexual offender may petition to be removed from the registry after ten years, and his petition will be considered in light of a number of factors, including his history of compliance with the Act's restrictions. A violent sexual offender, however, will remain on the registry for the remainder of his life. Tenn. Code Ann. § 40-39-207(g)(2).

A registered offender's Tennessee-issued driver's license will identify him as a sexual offender or violent sexual offender, as applicable. Tenn. Code Ann. § 55-50-353. He is required to carry his driver's license or equivalent government-issued photo identification card whenever outside his home. Tenn. Code Ann. § 40-39-213.

2. Registration and Updating Information

An offender registering for the first time must provide the following information, on penalty of perjury:

(1) Complete name and all aliases, including, but not limited to, any names that the offender may have had or currently has by reason of marriage or otherwise, including pseudonyms and ethnic or tribal names;

(2) Date and place of birth;

(3) Social security number;

(4) A photocopy of a valid driver license, or if no valid driver license has been issued to the offender, a photocopy of any state or federal government issued identification card;

_____

[5] A separate category exists for "violent juvenile sexual offenders," Tenn. Code Ann. § 40-39-202(28), which is not relevant to this case.

7

(5) For an offender on supervised release, the name, address and telephone number of the registrant's probation or parole officer or other person responsible for the registrant's supervision;

(6) Sexual offenses or violent sexual offenses for which the registrant has been convicted, the date of the offenses and the county and state of each conviction; or the violent juvenile sexual offense for which the registrant has been adjudicated delinquent, the date of the act for which the adjudication was made and the county and state of each adjudication;

(7) Name of any current employers and length of employment, including physical addresses and phone numbers;

(8) Current physical address and length of residence at that address, which shall include any primary or secondary residences . . . ;

(9) Mailing address, if different from physical address;

(10) Any vehicle, mobile home, trailer or manufactured home used or owned by an offender, including descriptions, vehicle information numbers and license tag numbers;

(11) Any vessel, live-aboard vessel or houseboat used by an offender, including the name of the vessel, description and all identifying numbers;

(12) Name and address of each institution of higher education in this state where the offender is employed or practices a vocation or is a student;

(13) Race and gender;

(14) Name, address and phone number of offender's closest living relative;

(15) Whether victims of the offender's convictions are minors or adults, the number of victims and the correct age of the victim or victims and of the offender at the time of the offense or offenses, if the ages are known;

(16) Verification by the TBI or the offender that the TBI has received the offender's DNA sample;

(17) A complete listing of the offender's electronic mail address information, including usernames, any social media accounts the offender uses or intends to use, instant message, other internet communication platforms or devices, and the offender's username, screen name, or other method by which the offender accesses these accounts or websites;

(18) Whether any minors reside in the primary or secondary residence;

(19)(A) Any other registration, verification and tracking information, including fingerprints and a current photograph of the offender, vehicles and vessels, as referred to in subdivisions (i)(10) and (i)(11), as may be required by rules promulgated by the TBI . . . ;

(20) Copies of all passports and immigration documents; and

(21) Professional licensing information that authorizes an offender to engage in an occupation or carry out a trade or business.

8

Tenn. Code Ann. § 40-39-203(*i*). The Act provides that much of this information, including the registrant's photograph, address and employer, "shall be considered public information" and must be made available to the public through a web page. Tenn. Code Ann. § 40-39-206(d).

The offender also has an ongoing duty to keep the state's information up to date. "Within forty-eight (48) hours of establishing or changing a primary or secondary residence, establishing a physical presence at a particular location, becoming employed or practicing a vocation or becoming a student in this state, the offender shall register or report in person" with the appropriate law enforcement agency.[6] Tenn. Code Ann. § 40-39-203(a)(1). A registrant also has 48 hours to report any "change in any other information given to the registering agency by the offender that is contained on the registration form" or any "material change in employment or vocation status." Tenn. Code Ann. § 40-39-203(a)(4), (6). The registrant has "three (3) days, excluding holidays" to report any change in his "electronic mail address information, any instant message, chat or other internet communication name." Tenn. Code Ann. § 40-39-203(7).

If the registrant fails to provide any of the required updated information within the time periods required, he has committed a Class E felony. Tenn. Code Ann. § 40-39-208(b). The registrant's first such offense is "punishable by a fine of not less than three hundred fifty dollars ($350) and imprisonment for not less than ninety (90) days." Tenn. Code Ann. § 40-39-208(c). The second violation "is punishable by a fine of not less than six hundred dollars ($600) and imprisonment for not less than one hundred eighty (180) days." Tenn. Code Ann. § 40-39-208(d). Any subsequent violations are "punishable by a fine of not less than one thousand one

_____

[6] Although the TBI administers the sexual offender registration itself, many of the ongoing activities related to registration are overseen by the registrant's "[d]esignated law enforcement agency," which is defined as "any law enforcement agency that has jurisdiction over the primary or secondary residence, place of physical presence, place of employment, school or institution of higher education where the student is enrolled or, for offenders on supervised probation or parole, the department of correction or court ordered probation officer." Tenn. Code Ann. § 40-39-202(2).

9

hundred dollars ($1,100) and imprisonment for not less than one (1) year." Tenn. Code Ann. § 40-39-208(e).

### 3. In-Person Reporting and Fees

The Act also requires periodic in-person reporting with the offender's designated law enforcement agency. Violent sexual offenders must "report in person during the months of March, June, September, and December of each calendar year, to the designated law enforcement agency, on a date established by such agency, to update the offender's fingerprints, palm prints and photograph, as determined necessary by the agency, and to verify the continued accuracy of the information in the TBI registration form." Tenn. Code Ann. § 40-39-204(b)(1). Sexual offenders must report in person once per year. Tenn. Code Ann. § 40-39-204(c). At the sexual offender's check-in, or the violent sexual offender's first check-in, he is required to pay administrative fees not to exceed $150. Tenn. Code Ann. § 40-39-204(b)(1), (c). If the offender lives in a county or municipality that has adopted a "community notification system" to inform the public when a sexual offender moves in nearby, the offender may be liable for an additional $50 fee. Tenn. Code Ann. § 40-39-217(a)(2).

### 4. Restrictions on Where a Registrant Can Live or Work

A registered offender may not

knowingly establish a primary or secondary residence or any other living accommodation or knowingly accept employment within one thousand feet (1,000') of the property line of any [1] public school, [2] private or parochial school, [3] licensed day care center, [4] other child care facility, [5] public park, [6] playground, [7] recreation center, or [8] public athletic field available for use by the general public.

Tenn. Code Ann. § 40-39-211(a)(1). There is an exception if the proximity exists solely because of the change in ownership of a property after the offender established the residence or began the job. Tenn. Code Ann. § 40-39-211(e). Violating this restriction is a Class E felony. Tenn. Code

Ann. § 40-39-211(f). The first violation is "punishable by a fine of not less than three hundred fifty dollars ($350) and imprisonment for not less than ninety (90) days." Tenn. Code Ann. § 40-39-211(g)(1). The second violation "is punishable by a fine of not less than six hundred dollars ($600) and imprisonment for not less than one hundred eighty (180) days." Tenn. Code Ann. § 40-39-211(g)(2). Any subsequent violations are "punishable by a fine of not less than one thousand one hundred dollars ($1,100) and imprisonment for not less than one (1) year." Tenn. Code Ann. § 40-39-211(g)(3).

### 5. Restrictions on Registrant's Movements

A registered offender is forbidden from knowingly

> [b]e[ing] upon or remain[ing] on the premises of any building or grounds of any [1] public school, [2] private or parochial school, [3] licensed day care center, [4] other child care facility, [5] public park, [6] playground, [7] recreation center or [8] public athletic field available for use by the general public in this state when the offender has reason to believe children under eighteen (18) years of age are present.

Tenn. Code Ann. § 40-39-211(d)(1). There are exceptions for certain expressly enumerated parenting-related activities, but those exceptions are only available if the offender has obtained "written permission or a request from the school's principal or the facility's administrator." Tenn. Code Ann. § 40-39-211(d)(2)(B). A separate provision allows a registered offender to pick up and drop off his child if he has provided the relevant administrator with written notice— meaning that, although the administrator can deny permission for most purposes, the administrator cannot prevent the offender from transporting his child to and from the school or facility, as long as the offender leaves immediately and does not otherwise come onto the premises. Tenn. Code Ann. § 40-39-211(d)(2)(D).

An offender is also forbidden from "[s]tand[ing], sit[ting] idly, whether or not the offender is in a vehicle, or remain[ing] within one thousand feet (1,000') of the property line of

any" of the aforementioned facilities "when children under eighteen (18) years of age are present, while not having a reason or relationship involving custody of or responsibility for a child or any other specific or legitimate reason for being there." Tenn. Code Ann. § 40-39-211(d)(1)(B).

A violation of any of these restrictions is a Class E felony. Tenn. Code Ann. § 40-39-211(f). The first violation is "punishable by a fine of not less than three hundred fifty dollars ($350) and imprisonment for not less than ninety (90) days." Tenn. Code Ann. § 40-39-211(g)(1). The second violation "is punishable by a fine of not less than six hundred dollars ($600) and imprisonment for not less than one hundred eighty (180) days." Tenn. Code Ann. § 40-39-211(g)(2). Any subsequent violations are "punishable by a fine of not less than one thousand one hundred dollars ($1,100) and imprisonment for not less than one (1) year." Tenn. Code Ann. § 40-39-211(g)(3). A violation that is "due solely to a lack of the written permission required," however, is punishable only by fine. Tenn. Code Ann. § 40-39-211(g)(4).

<u>6. Additional Restrictions Related to Children</u>

A registered offender may not "be alone with a minor or minors in a private area," defined generally as "any real or personal property, regardless of ownership, where the conduct of the offender is not readily observable by anyone but the minor or minors alone with the offender." Tenn. Code Ann. § 40-39-211(k)(1)(B), (2). Exceptions exist for the offender's own child, if certain criteria are met. Tenn. Code Ann. § 40-39-211(c), (k)(2). A violation is a Class E felony. Tenn. Code Ann. § 40-39-211(f). The first violation is "punishable by a fine of not less than three hundred fifty dollars ($350) and imprisonment for not less than ninety (90) days." Tenn. Code Ann. § 40-39-211(g)(1). The second violation "is punishable by a fine of not less than six hundred dollars ($600) and imprisonment for not less than one hundred eighty (180)

12

days." Tenn. Code Ann. § 40-39-211(g)(2). Any subsequent violations are "punishable by a fine of not less than one thousand one hundred dollars ($1,100) and imprisonment for not less than one (1) year." Tenn. Code Ann. § 40-39-211(g)(3).

## C. Carl E. Jordan

In 1980, Jordan, then 19 years old, raped a 42-year-old woman during an armed robbery.[7] (Doc. No. 59 ¶ 1.) The next year, he pleaded guilty to multiple counts stemming from the incident, including one count of aggravated rape. He was initially sentenced to 40 years in prison, but, after a 1986 appeal, he reentered his plea and received a slightly reduced sentence of 35 years. (Doc. No. 64 ¶ 2.) Ultimately, Jordan served nearly twenty-five years in prison before being released in 2005 at the age of 43. (Doc. No. 59 ¶ 3.)

At the times of Jordan's crime, plea, second plea, and sentencing, Tennessee had no sexual offender registry—either in the limited informational model that characterized Tennessee's early system or in the significantly more robust model of monitoring and restrictions in effect today. While Jordan was serving his sentence, however, Tennessee established its registry and began the now-familiar process of legislatively adding additional requirements and restrictions for those required to register. Shortly before Jordan was released, the state informed him of his obligations under the Act. (*Id.* ¶ 7.)

Jordan found the Act's requirements demanding and intrusive—so much so that he felt that he had lost the "second chance at freedom" that he believed was his due after serving the decades-long sentence that had actually been imposed on him at the time of his conviction. (*Id.* ¶

---

[7] Jordan committed the robbery with another man, Lewis Corbitt. A second victim—that is, a victim other than the woman whom Jordan raped—was killed during the burglary. *State v. Jordan*, No. 85-265-III, 1986 WL 5038, at *1 (Tenn. Crim. App. May 2, 1986). Although Jordan insisted that it was Corbitt who killed that victim, Jordan himself ultimately pleaded guilty to second-degree murder as part of a broader plea deal associated with the underlying events. *See id.* Jordan's murder conviction is not the basis for his inclusion on the registry, nor could it be under current law. The only act for which Johnson is on the registry is the rape. (Doc. No. 59 ¶ 1.)

13

14.) Jordan's complaints were not only about the Act's harshness; he specifically felt that he should not have been required to comply with a system that had been imposed on him retroactively. (Doc. No. 59 ¶ 9; Doc. No. 61[8] ¶ 9.) Jordan repeatedly raised his objections to MNPD officers during his required in-person visits to MNPD, the agency overseeing his compliance. (Doc. No. 59 ¶ 15; Doc. No. 61 ¶ 15.) In response to Jordan's complaints that he was blindsided by the requirements being imposed on him, MNPD Detective David Elliot explained to Jordan that his registry obligations were pursuant to a "new law." (Doc. No. 59 ¶ 12; Doc. No. 61 ¶ 12.)

Jordan, faced with the already difficult task of finding a place for himself in the outside world after having spent nearly his entire adult life in prison, struggled with both the stigma and restrictions of the Act. He was rejected from a number of apartments and only able to find initial housing at a group home for "mentally ill patients," despite not having any mental illness requiring such a placement himself. Rather, Jordan lived in the group home as, in effect, live-in staff, helping the actual patients in exchange for housing. (Doc. No. 59 ¶¶ 17–18.) Although he was, for periods of time, able to move in with other people, such as his sister or a then-current girlfriend, he was not able to find a "regular apartment" of his own until after he was removed from the registry pursuant to an injunction of this court. (Doc. No. 49-2 at 102; Doc. No. 59 ¶¶ 21, 30.)

---

[8] In Metro's Response to Jordan's Statement of Undisputed Material Facts, it frequently responds to Jordan's assertions by either (1) raising an objection to the fact's relevance based on Metro's reading of the law and otherwise wholly failing to address whether the fact is disputed or (2) raising that same objection and disputing the fact asserted only partially and/or vaguely. Under this court's Local Rules, a party opposing a motion for summary judgment must "respond to each fact set forth by the movant by either (i) agreeing that the fact is undisputed; (ii) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (iii) demonstrating that the fact is disputed." L.R. 56.01(c). If the nonmoving party contends that a particular fact is disputed, then the nonmoving party's assertion, like the movant's, "must be supported by specific citation to the record." *Id.* Accordingly, any fact that Metro has not identified as disputed with citation to the record is taken as conceded, insofar as it is relevant.

14

After he was released, Jordan was able to find a job in a warehouse, where he worked until 2016. In 2011, he missed eight days of work, worth about $640 in wages, because he was arrested and jailed for a failure to timely update his registry information. After his warehouse job ended in 2016, he was unable to find other work and was rejected by several employers due to issues related to the Act. (Doc. No. 59 ¶¶ 22–26.)

MNPD routinely performed unannounced "compliance checks" on Jordan, which consisted of officers' coming to his home and questioning him. (*Id.* ¶¶ 28–29.) Although there is no evidence in the record that these compliance checks ever prevented Jordan from committing a sexual offense, they did have the apparent effect of setting off a humiliating and dispiriting campaign of harassment against him by his neighbors. Jordan testified at deposition:

> A few times I thought about committing suicide. You know what I'm saying? Because it was just so much stress. When they used to come over . . . to my house and check to see that I'm here, I used to look out the window. They'd talk to the neighbors. And then I'd come out the next morning.· There's trash throwed all in the yard for the next couple of days. Somebody done took the trash can and throwed it all in the front yard. I know [it was] because somebody told them there's a sex offender in the house.

(Doc. No. 49-2 at 100.)

When Detective Elliott first told Jordan, around the time of his release, that Jordan was required to register pursuant to a "new law," Detective Elliott also explained to Jordan he could be removed from the registry after ten years. (Doc. No. 59 ¶ 12.) By the time ten years had passed, however, the law had changed again, and Jordan's conviction was classified as one that would require him to register for life, with no opportunity for removal. *See* Tenn. Code Ann. § 40-39-207(g)(2)(B). Jordan, however, was not immediately aware of the change; rather, in 2015, after Jordan had been on the registry for the expected ten years, Detective Elliott told him that,

contrary to MNPD's initial representations to Jordan, there was no longer any hope of Jordan's getting taken off of the registry under Tennessee law. (*Id.* ¶¶ 34–35.)

In 2016, Jordan apparently failed to pay his annual $150 registration fee in a timely manner, and MNPD began the process of effecting his arrest. There are a number of options available to law enforcement when it comes to taking a person into custody. In Jordan's case, MNPD elected to send about a dozen police, in what Jordan estimated to be about seven different police cars, to line up on multiple sides of his home. Jordan testified that this was despite the fact that he had been in touch with MNPD about reporting in person the next day. (Doc. No. 49-2 at 128–29; Doc No. 59 ¶ 37.)

Finally, Jordan has also complained of the Act's effect on his ability to participate in family activities. In 2019, he booked a cruise to go on vacation with his sister, but he was ultimately rejected due to his registry status. (Doc. No. 59 ¶ 42.) He also complains that he is unable to take his two nieces anywhere as their uncle. (*Id.* ¶ 40.)

### D. Jordan's Lawsuit

On October 15, 2019, Jordan filed a *pro se* Complaint, suing a number of defendants, including the Governor and Director, based on his continuing status as a registered violent sexual offender and the enforcement of the Act against him. (Doc. No. 1.) The court appointed counsel for Jordan (Doc. No. 7), and, on April 1, 2020, Jordan filed a First Amended Complaint, naming the Governor, the Director, and Metro as the only three defendants. (Doc. No. 10.) He pleaded one count, pursuant to 42 U.S.C § 1983, for the deprivation of his constitutional right not to be subject to *ex post facto* punishments for the crime he committed before the sexual offender registry existed. (*Id.* ¶¶ 56–64.) On June 9, 2020, he filed a Motion for Preliminary Injunction, requesting that the court prohibit any of the defendants from enforcing the Act against him.

16

(Doc. No. 25 at 1.) On August 12, 2020, the court granted Jordan's request, finding, among other things, that he had a "strong likelihood of success" on his claims, particularly those against the Governor and Director. (Doc. No. 39 at 38.) The parties engaged in discovery relevant to Jordan's claims, and now each party seeks summary judgment in its favor.

## E. Additional Facts Related to Summary Judgment

The fundamental details of Jordan's situation are mostly undisputed, aside from disagreements that go more to characterization than to truth or falsity. However, the particularities of Jordan's situation—aside from when he committed his offense—are of only limited importance to the merits of his *Ex Post Facto* Clause challenge. Under current Supreme Court precedent, constitutional *ex post facto* protections, generally speaking, do not depend on "the effect that [a challenged law] has on a single individual," but rather the punitive nature of the "statute on its face." *Seling v. Young*, 531 U.S. 250, 262 (2001) (quoting *Hudson v. United States*, 522 U.S. 93, 100 (1997)). While Jordan's experience is nevertheless relevant, insofar as it provides one limited example of how the Act has worked on the ground, the constitutionality of retroactive application of the Act must ultimately hinge on a much more general consideration of its purpose and effects. In accordance with that principle, the parties have introduced a number of facts—some undisputed, some disputed—bearing on the purposes, effects, and function of the Act generally in Tennessee.

The Governor and the Director concede the following facts for the purposes of Jordan's motion for summary judgment:

- "There is no evidence tending to show that [the Act] generally reduces the incidence of criminal offenses." (Doc. No. 59 ¶ 46.)

- "There is no evidence to show any other societal benefits of [the Act]." (*Id.* ¶ 47.)

17

- "There is no evidence indicating that the legislature considered any evidence in enacting any aspect of [the Act]." (*Id.* ¶ 48.)

- "There is no evidence tending to show that failure to enforce [the Act] on [Jordan] will increase the likelihood of [Jordan's] committing future offenses." (*Id.* ¶ 49.)

- "There are no ways in which Tennessee has narrowed [the Act] in order to avoid infringing the Constitutional right against *ex post facto* punishment." (*Id.* ¶ 50.)

- "Defendants have no justifications other than the text of the [Act] for enforcing [the Act] on [Jordan] notwithstanding his Constitutional right against *ex post facto* punishment." (*Id.* ¶ 51.)

Metro, in contrast, does not expressly concede those assertions as undisputed for the purposes of Jordan's motion. Instead, Metro responds to each of those assertions by objecting that (1) the assertion is irrelevant, because it involves Jordan as an individual, and *Ex Post Facto* Clause determinations should not be made on a case-by-case basis; and (2) the "statement mischaracterizes the cited sources from the record." (Doc. No. 61 ¶¶ 46–51.)

As this court noted in its opinion of August 12, 2020, Jordan's claim against Metro faces an obstacle that his claims against the Governor and Director do not: the need, under the governing caselaw, to establish municipal liability of Metro itself as a governmental entity, as opposed to the official-capacity liability for prospective relief that attaches to the Governor and Director as state officials. *See Diaz v. Michigan Dep't of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013) (discussing *Ex parte Young*, 209 U.S. 123 (1908)); *Miller v. Calhoun Cty.*, 408 F.3d 803, 815 (6th Cir. 2005) (discussing municipal liability under § 1983). (*See* Doc. No. 39 at 17–23.) To that end, Jordan has asserted a number of facts regarding Metro's practices related to the Act, many of which Metro either concedes as undisputed or has failed to substantively dispute.

18

The parties agree that "Metro has maintained and funded a dedicated [registry]-enforcement unit for over a decade, staffed by two full-time [registry] detectives who are supported by an administrative assistant." (Doc. No. 61 ¶ 52.) Until 2018, that unit was part of MNPD's broader sex crimes unit, but, since that year, the "Sexual Offender Registry Unit" has been its own distinct entity. (*Id.* ¶¶ 53–54.) The unit's activities are extensive. For example, in 2019, MNPD's registry detectives conducted over 2,500 "investigations," obtained 333 warrants, and arrested 94 people. (*Id.* ¶ 60.) They also conducted hundreds of "home verifications"—surprise "compliance check" visits to the homes of registrants. (*Id.* ¶¶ 60–63.)

Metro concedes that, "based on state law and TBI guidance, MNPD's enforcement of [the Act] applies to all sex offenders on the registry." (*Id.* ¶ 57.) As part of the discovery in this case, Metro furnished a Rule 30(b)(6) witness, Harmon Hunsicker, to address questions of Metro policy during a deposition.[9] Hunsicker testified that MNPD's policy was to enforce the Act against "whoever's supposed to be on the sex offender registry," regardless of whether a particular offender committed his criminal acts prior to the Act's enactment. (Doc. No. 49-9 at 53.) Hunsicker was asked about any "standards or guidelines" regarding when MNPD detectives "should arrest and file charges" based on a violation of the Act, and he testified that the detectives should do so any time they have "investigated and confirmed there's a violation." (*Id.* at 82.)

## II. LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment as to the claim of an adverse

---

[9] Hunsicker's deposition also served as the Rule 30(b)(6) deposition in at least one other case involving the same type of challenge and the same counsel.

party, a moving defendant must show that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Conversely, to win summary judgment as to his own claims, a moving plaintiff must demonstrate that no genuine issue of material fact exists as to all essential elements of his claims. "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d 374 (citing *Anderson*, 477 U.S. at 252).

## II. ANALYSIS

The Governor and Director argue that they are entitled to summary judgment because Jordan "cannot bear his heavy burden of proof to show that applying the Act to him violates the Ex Post Facto Clause." (Doc. No. 55 at 1.) Metro, as well, disputes that Jordan should succeed on the merits, but it also argues that, even if Jordan's rights were violated, Metro is entitled to summary judgment because Jordan "has not advanced sufficient evidence to show that Metro can

be held liable under § 1983 for the enforcement of [the Act] against him." (Doc. No. 52 at 1.) Jordan argues that the evidence he has produced is not only sufficient to overcome the defendants' motions but also to support summary judgment in Jordan's favor "as to liability." (Doc. No. 49 at 1.)

**A. *Ex Post Facto* Application of the Act**

<u>1. Governing Law</u>

The parties agree that the government may not "retroactively . . . increase the punishment for criminal acts." *Collins*, 497 U.S. at 43. It is also well-settled that this prohibition covers more than express changes to the particular statutory sentence associated with an offense. *See Peugh*, 569 U.S. at 539 (noting that the Supreme Court has "never accepted the proposition that a law must increase the maximum sentence for which a defendant is eligible in order to violate the *Ex Post Facto* Clause.") (citing *Lindsey v. Washington*, 301 U.S. 397 (1937)). To the contrary, a state's "[s]ubtle *ex post facto* violation[]" is "no more permissible than [an] overt one[]." *Collins*, 497 U.S. at 46. The parties disagree, however, with regard to whether or not the parcel of obligations, liabilities, and restrictions arising out of the Act qualifies as a punishment.

The Supreme Court has held that a state's operation of a sexual offender registry that includes offenders whose crimes took place prior to the registry's adoption does not, in and of itself, amount to an *Ex Post Facto* Clause violation, because a simple registry, without additional harms and restrictions, is not inherently a mechanism of punishment. Specifically, in *Smith v. Doe*, 538 U.S. 84 (2003), the Supreme Court considered the constitutionality of the retroactive application of an Alaska sexual offender law that consisted of "two components: a registration requirement and a notification system." *Id.* at 90. To determine whether the registry amounted to a retroactive punishment, the Court applied the standard it had established in *Kansas v.*

*Hendricks*, 521 U.S. 346, 366 (1997), which had involved a challenge to a statute governing involuntary commitment of certain mentally ill sex offenders:

> We must "ascertain whether the legislature meant the statute to establish 'civil' proceedings." If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is "so punitive either in purpose or effect as to negate [the State's] intention to deem it 'civil.'"

*Smith*, 538 U.S. at 92 (quoting *Hendricks*, 521 U.S. at 361). The Court added that, because a legislature is entitled to considerable deference when it states its purpose, "'only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* (quoting *Hudson v. United States*, 522 U.S. 93, 100 (1997)). The Court concluded, based on the language of the Alaska statute, that the Alaska registry system was intended to be civil in nature, giving rise to a presumption that it was not punitive. *Id.* at 94–95.

The Court therefore turned to the question of whether the Alaska statute had a punitive purpose or effect. The Court concluded that its analysis should be guided by the factors related to the punitive character of a statute set forth in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963):

> [1] Whether the sanction involves an affirmative disability or restraint, [2] whether it has historically been regarded as a punishment, [3] whether it comes into play only on a finding of scienter, [4] whether its operation will promote the traditional aims of punishment—retribution and deterrence, [5] whether the behavior to which it applies is already a crime, [6] whether an alternative purpose to which it may rationally be connected is assignable for it, and [7] whether it appears excessive in relation to the alternative purpose assigned.

*Id.* at 168–69 (internal footnotes omitted). Particularly relevant, the Court wrote, were the questions of whether the challenged regulation "has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of

punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose." *Smith*, 538 U.S. at 97.

Based on those factors, the Supreme Court concluded that the Alaska registration system was not punitive in character. Among the grounds for its conclusion was that the Alaska law "impose[d] no physical restraint." *Smith*, 538 U.S. at 100. The Court also noted that, unlike with criminal regimes such as probation, "offenders subject to the Alaska statute are free to move where they wish and to live and work as other citizens, with no supervision." *Id.* at 101. With regard to the lifelong duration of the reporting requirements for some offenders, the Court concluded it was not excessive, citing "[e]mpirical research" on recidivism among child molesters. *Id.* at 104.

A few years later, in *Doe v. Bredesen*, 507 F.3d 998 (6th Cir. 2007), the Sixth Circuit considered the application of the *Ex Post Facto* Clause to the version of the Tennessee registration regime in force at the time. As *Smith* requires, the court looked first to whether the Tennessee General Assembly had expressly designated the law as civil or whether it had declared some punitive intent. The Act, then as now, included provisions stating that the purpose of the Act is public safety, that the Act "shall not be construed as punitive," and that "the general assembly does not intend that the information be used to inflict retribution or additional punishment on those offenders." Tenn. Code Ann. § 40-39-201(6), (8). The court therefore turned to the second part of the *Smith* inquiry—whether the punitive purpose or effect of the Act was sufficient to overcome the stated legislative intention. *Doe*, 507 F.3d at 1004. Relying on the multi-factor *Mendoza-Martinez* test, the court concluded that the Act was not punitive. The court noted, in particular, that "registration, reporting, and surveillance components are not of a type that we have traditionally considered as a punishment" and that the Act does not "prevent [a

23

registered offender] from changing jobs or residences or traveling to the extent otherwise permitted by their conditions of parole or probation."[10] *Id.* at 1005.

Meanwhile, the Tennessee General Assembly continued its pattern of expanding the requirements of the registration regime by amendment, particularly with regard to restrictions related to children, even for registrants whose only victims were adults. For example, restrictions about entering schools, playgrounds and other facilities were added in 2008. *See* 2008 Tenn. Pub. Acts, ch. 1164, § 11. Restrictions related to libraries were added in 2011. *See* 2011 Tenn. Pub. Acts, ch. 287. The Act's residence restrictions regarding schools and other facilities were extended to offenders whose victims were adults in 2014. *See* 2014 Tenn. Pub. Acts, ch. 992, § 1. The prohibition on being alone with children other than one's own in a "private area" were added in 2015. *See* 2015 Tenn. Pub. Acts, ch. 516.

In 2016, the Sixth Circuit considered the issue of retroactive application of registration laws anew in *Does #1-5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016). That case involved Michigan's sex offender registration system, which, the court wrote, "began in 1994 as a non-public registry maintained solely for law enforcement use" but "ha[d] grown into a byzantine code governing in minute detail the lives of the state's sex offenders." *Id.* at 697. The court recounted a history of amendments strikingly similar, though not identical, to Tennessee's:

> Over the first decade or so of SORA's[11] existence, most of the changes centered on the role played by the registry itself. In 1999, for example, the legislature

---

[10] The Act did, at the time, restrict where a registered offender could live or work, which had been discussed at length at the district court level. The district court, consistently with the law, concluded that, "[w]hile provisions of the Act restrict sexual offenders from establishing a residence or employment within a certain radius of schools or child care facilities, offenders do not need permission to move or change jobs and are free to live and work away from those restricted areas." *Doe v. Bredesen*, No. 3:04-CV-566, 2006 WL 849849, at *8 n.5 (E.D. Tenn. Mar. 28, 2006). The court construes the Sixth Circuit's opinion as making the same point, rather than suggesting that changing jobs or residences was not impeded to any extent.

added the requirement that sex offenders register in person (either quarterly or annually, depending on the offense) and made the registry available online, providing the public with a list of all registered sex offenders' names, addresses, biometric data, and, since 2004, photographs. *See* Mich. Pub. Act. 85 §§ 5a(4), 8(2), 10(2)(3) (1999); Mich. Pub. Acts 237, 238 (2004). Michigan began taking a more aggressive tack in 2006, however, when it amended SORA to prohibit registrants (with a few exceptions, *see* Mich. Comp. Laws § 28.734–36) from living, working, or "loitering" within 1,000 feet of a school. *See* Mich. Pub. Acts 121, 127 (2005). In 2011, the legislature added the requirement that registrants be divided into three tiers, which ostensibly correlate to current dangerousness, but which are based, not on individual assessments, but solely on the crime of conviction. *See* Mich. Pub. Acts 17, 18 (2011). The 2011 amendments also require all registrants to appear in person "immediately" to update information such as new vehicles or "internet identifiers" (e.g., a new email account). *See id.* The 2006 and 2011 amendments apply retroactively to all who were required to register under SORA. *See* Mich. Pub. Act 46 (2006); Mich. Pub. Acts 17, 18 (2011). Violations carry heavy criminal penalties. *See* Mich. Comp. Laws § 28.729.

*Snyde*r, 834 F.3d at 697–98. Five plaintiffs challenged the law on various grounds, including the *Ex Post Facto* Clause. The case went to a bench trial, which permitted the development of a significant factual record. The Sixth Circuit, based on that record, noted that the plaintiffs "had trouble finding a home in which they c[ould] legally live or a job where they c[ould] legally work," and "those Plaintiffs who ha[d] children (or grandchildren)" were prevented "from watching them participate in school plays or on school sports teams" or from "visiting public playgrounds with their children for fear of 'loitering.'" *Id.* at 698.

The Sixth Circuit performed the first step of the *Smith* analysis and found—as courts typically do[12]—that the statute purported to be civil and non-punitive on its face. *Id.* at 700–01.

---

[11] "SORA" stands for "Sex Offender Registration Act," an acronym used for Michigan's Act and also used generically to refer to many states' acts, including often Tennessee's—even though that is not actually the present name for the Act.

[12] Indeed, it is difficult for this court to see how any retroactive law enacted or amended since *Smith* is likely to fail the first portion of the test, other than through legislative inadvertence. Any legislature that wishes its enactment to survive constitutional review knows that it can, while sacrificing nothing of the content of the statute, include a *pro forma* claim of civil intent and become eligible for deferential review under *Smith*.

The court then focused the second part of the *Smith* analysis on the five *Mendoza-Martinez* factors that *Smith* had identified as particularly salient in registry cases:

> (1) Does the law inflict what has been regarded in our history and traditions as punishment?
>
> (2) Does it impose an affirmative disability or restraint?
>
> (3) Does it promote the traditional aims of punishment?
>
> (4) Does it have a rational connection to a non-punitive purpose?
>
> (5) Is it excessive with respect to this purpose?

*Id.* at 701 (citing *Smith*, 538 U.S. at 97.)

With regard to the first factor—history and tradition—the court noted that, although Michigan's act had "no direct ancestors in our history and traditions," it "resemble[d], in some respects at least, the ancient punishment of banishment" as well as "traditional shaming punishments." *Id.* at 701–02. The court cited evidence that vast swaths of the state's more populous areas were unavailable to the registrants for living or working, and the registrants were branded with derogatory classifications that did not reflect an individualized determination that the descriptor was justified. *Id.* The court also observed that life under the Michigan system, unlike life under the Alaska system upheld in *Smith*, "resembles the punishment of parole/probation." *Id.* at 703. The court explained:

> registrants are subject to numerous restrictions on where they can live and work and, much like parolees, they must report in person, rather than by phone or mail. Failure to comply can be punished by imprisonment, not unlike a revocation of parole. And while the level of individual supervision is less than is typical of parole or probation, the basic mechanism and effects have a great deal in common. In fact, many of the plaintiffs have averred that SORA's requirements are more intrusive and more difficult to comply with than those they faced when on probation.

*Id.*

The court also found that the second factor—affirmative disability and restraint—favored a finding of punitive effect, in light of the aforementioned restrictions on a registered offender's residence, work, and movement. The court observed that those restrictions amounted to "restraints . . . greater than those imposed by the Alaska statute [at issue in *Smith*] by an order of magnitude." *Id.* With regard to factor three—the traditional aims of punishment—the court concluded that the Michigan act

> advances all the traditional aims of punishment: incapacitation, retribution, and specific and general deterrence. Its very goal is incapacitation insofar as it seeks to keep sex offenders away from opportunities to reoffend. It is retributive in that it looks back at the offense (and nothing else) in imposing its restrictions, and it marks registrants as ones who cannot be fully admitted into the community. Further, . . . it does so in ways that relate only tenuously to legitimate, non-punitive purposes. Finally, its professed purpose is to deter recidivism . . . , and it doubtless serves the purpose of general deterrence.

*Id.* at 704.

The last two factors—rational relationship to purpose and excessiveness—are closely related because they both consider the degree to which a law serves its stated civil purpose, as opposed to, for example, a desire for retribution or stigmatization appropriate only in the criminal context. The Sixth Circuit found that, based on the evidence in the record, the connection between the registration regime and its stated public safety purposes was weak. The court noted a study "suggest[ing] that sex offenders (a category that includes a great diversity of criminals, not just pedophiles) are actually *less* likely to recidivate than other sorts of criminals." *Snyder*, 834 F.3d at 704 (citing Lawrence A. Greenfield, Recidivism of Sex Offenders Released from Prison in 1994 (2003)). "In fact," the court observed, "one statistical analysis in the record concluded that laws such as SORA actually *increase* the risk of recidivism, probably because they exacerbate risk factors for recidivism by making it hard for registrants to get and keep a job, find housing, and reintegrate into their communities." *Id.* at 704–05 (citing J.J. Prescott & Jonah

E. Rockoff, *Do Sex offender Registration and Notification Laws Affect Criminal Behavior?,* 54 J.L. & Econ. 161, 161 (2011)). Likewise, with regard to excessiveness, the court observed that the Michigan law imposed a number of laborious requirements on offenders for which the actual public safety benefits were, at best, speculative, concluding that the "punitive effects of these blanket restrictions thus far exceed even a generous assessment of their salutary effects." *Id.* at 705.

The court accordingly found that the Michigan law was punitive in effect and could not be imposed retroactively. *Id.* (collecting similar holdings from other courts). The court forcefully explained:

> A regulatory regime that severely restricts where people can live, work, and "loiter," that categorizes them into tiers ostensibly corresponding to present dangerousness without any individualized assessment thereof, and that requires time-consuming and cumbersome in-person reporting, all supported by—at best—scant evidence that such restrictions serve the professed purpose of keeping Michigan communities safe, is something altogether different from and more troubling than Alaska's first-generation registry law. SORA brands registrants as moral lepers solely on the basis of a prior conviction. It consigns them to years, if not a lifetime, of existence on the margins, not only of society, but often, as the record in this case makes painfully evident, from their own families, with whom, due to school zone restrictions, they may not even live. It directly regulates where registrants may go in their daily lives and compels them to interrupt those lives with great frequency in order to appear in person before law enforcement to report even minor changes to their information.
>
> We conclude that Michigan's SORA imposes punishment.

*Id.* at 705.

### 2. Application of *Snyder* to this Case

Although the Governor and Director maintain that *Snyder* was "wrongly decided," it is undisputed that *Snyder* is the law of this circuit and binding on this court. (Doc. No. 56 at 6.) *Snyder*, moreover, was not simply a case setting forth the general *Ex Post Facto* Clause principles at issue here; *Snyder* involved precisely the kind of challenge Jordan has raised,

28

directed at a similar law that simply happened to be in another state. Broadly speaking, then, there are only three ways that *Snyder* could dictate any outcome other than a conclusion that the Act, like the Michigan law, is punitive for the purposes of the *Ex Post Facto* Clause analysis: first, the Act could differ from Michigan's law in some way sufficient to support a conclusion that Tennessee's scheme, unlike Michigan's, is non-punitive; second, *Tennessee itself* could differ from Michigan in some way that would render a law punitive in Michigan but non-punitive here; or, third, the evidence regarding registry laws relevant to the *Mendoza-Martinez* analysis could simply be so different here that *Snyder* is inapposite. The defendants, however, have not established any of those possibilities.

First, there is no meaningful way in which the Act is less like a traditional punishment than the Michigan law was. For example, although the Governor and Director list a number of ways in which, they argue, the Act's regime is less demanding than traditional parole,[13] they have not explained why any of those differences distinguishes this case from *Snyder*, which explicitly did not require the conditions of inclusion on the registry to be identical to the conditions of parole in order for there to be a constitutionally persuasive resemblance. In *Snyder*, the Sixth Circuit acknowledged that Michigan's registry scheme was "not identical to any traditional punishments," but it did not end its inquiry there. *Snyde*r, 834 F.3d at 703. Rather, the

---

[13] As Jordan points out, this aspect of the defendants' analysis relies on a certain amount of cherry-picking—contrasting the most restrictive forms of Tennessee parole with the restrictions of being on the registry, despite the fact that Tennessee parole incorporates a spectrum of more- and less-intrusive options, depending on the individual. *See, e.g.*, Tenn. Code Ann. § 40-35-303(c) (permitting both supervised and unsupervised probation, as appropriate); *see also* Tenn. Code Ann. § 40-28-116(b) (permitting the parole board, in its discretion, to "impose any conditions and limitations that the board deems necessary"); Tenn. Code Ann. § 40-28-601(b) (permitting a probation and parole officer to "suspend direct supervision of a parolee"). The defendants' comparison to parole also relies, in part, on improperly characterizing the burdens of the Act as consisting solely of the mandatory statutory consequences of registration and disregarding the more invasive enforcement efforts imposed by local law enforcement agencies like MNPD. "[I]t is the effect, not the form, of the law that determines whether it is *ex post facto*." *Weaver*, 450 U.S. at 31. The government cannot evade the actual punitive effects of the Act simply by offloading the responsibility onto local governments.

court acknowledged that the *Mendoza-Martinez* factors do not look merely to whether a law exactly replicates a traditional punishment, but whether it "resembles" one. *Id.* at 701. With regard to parole, in particular, the Sixth Circuit wrote:

> In *Smith*, which involved nothing more than reporting requirements, the [Supreme] Court took seriously the claim that the Alaska statute resembled parole/probation, acknowledging that "[t]his argument has some force, but," concluding that it was ultimately dissimilar because, unlike parolees, "offenders subject to the Alaska statute are free to move where they wish and to live and work as other citizens, with no supervision." 538 U.S. at 101. Under SORA, by contrast, registrants are subject to numerous restrictions on where they can live and work and, much like parolees, they must report in person, rather than by phone or mail. Failure to comply can be punished by imprisonment, not unlike a revocation of parole. *And while the level of individual supervision is less than is typical of parole or probation, the basic mechanism and effects have a great deal in common.*

*Snyder*, 834 F.3d at 703 (emphasis added).

The same analysis applies with regard to *Snyder*'s conclusion that Michigan's "requirements also resemble[d] traditional shaming punishments." *Snyder*, 834 F.3d at 702. Tennessee's Act, like Michigan's, is not an exact replica of traditional public shaming, but it bears meaningful similarities, and all of the supposed rejoinders offered by the defendants to those similarities would have been just as true in *Snyder* as they are here. The Governor and Director argue that the Act is not comparable to shaming because the Act "neither promotes face-to-face confrontations between the public and offenders nor seeks to humiliate the offender." (Doc. No. 56 at 9.) This argument has no merit. Michigan's registration scheme did not expressly promote fact-to-face confrontations or humiliation any more than Tennessee's does. Nevertheless, the law did humiliate registrants and expose them to potential interpersonal confrontation, just as the Act has humiliated Jordan and brought him into conflict with those around him.

*Snyder*'s comparison to the traditional punishment of exile also holds true in Tennessee. The geographic and demographic patterns of Michigan and Tennessee are, of course, not identical. The defendants, however, have not identified anything that might even *possibly* be so different between the states that it would dictate a different conclusion. The Sixth Circuit, in *Snyder*, used, as an example, an analysis of proximity to schools in Grand Rapids, Michigan—a city that, according to recent census figures,[14] has a population of about 200,000.[15] The defendants have been unable to identify any reason why living with the same basic restrictions would be significantly easier in the markedly *more* populous cities of Nashville (pop. ~690,000[16]) or Memphis (pop. ~645,000[17]). Of course, there are places in Tennessee where less-dense development presumably makes compliance easier. Again, though, that is an argument that could have prevailed in *Snyder* but did not. Michigan, like Tennessee, is a diverse state with various different types of communities, and the *Snyder* court expressly acknowledged that the Michigan regime was likely more burdensome in "densely populated areas" than elsewhere. *Snyder*, 834 F.3d at 701. That did not dissuade the Sixth Circuit from looking at the effects of the Act in those densely populated areas and concluding that they supported a finding of punitive effect.

---

[14] As the Governor and Commissioner note in their briefing (Doc. No. 66 at 16 n.3), "courts may take judicial notice of government statistics such as United States census data . . . ." *United States v. Neal*, 577 F. App'x 434, 452 (6th Cir. 2014) (citation omitted).

[15] *See* U.S. Census Bureau, QuickFacts: Grand Rapids city, Michigan, available at https://www.census.gov/quickfacts/fact/table/grandrapidscitymichigan#.

[16] *See* U.S. Census Bureau, QuickFacts: Nashville-Davidson metropolitan government (balance), Tennessee, available at https://www.census.gov/quickfacts/fact/table/nashvilledavidsonmetropolitangovernmentbalancetennessee/RTN131212.

[17] *See* U.S. Census Bureau, QuickFacts: Memphis city, Tennessee, available at https://www.census.gov/quickfacts/memphiscitytennessee.

31

The defendants complain that the plaintiffs in *Snyder* provided a map prepared by an expert witness identifying precisely how much the challenged law restricted the movement and residence of registrants in at least one city, whereas Jordan has not. But neither *Snyder*, nor the *Mendoza-Martinez* factors generally, requires an exact figure establishing the amount of territory in which a registrant's presence, movement, residency, or work is restricted. The question here is merely whether the Act excludes registrants from so much of their communities that it is comparable to banishment; what matters is the general scale of the effect, not every detail. While an expert-created map would undoubtedly help with such an inquiry, it is not mandated. The court's duty is to look at the evidence that *is* available in this case and determine what outcome the law requires.

Ultimately, whether one knows every inch of the cartography or not, there is simply no serious or plausible basis for denying that, in Tennessee's denser cities, schools, parks, and daycares are geographically commonplace and difficult to avoid. The court, moreover, is permitted to acknowledge as much without requiring Jordan to provide supplemental evidence to that effect. Rule 201 of the Federal Rules of Evidence permits a court, either by motion of a party or on its own motion, to "judicially notice a fact that is not subject to reasonable dispute because it" either "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." That includes taking judicial notice of indisputable facts about a region's basic geography. *See Tucker v. Outwater*, 118 F.3d 930, 935 (2d Cir. 1997) ("[T]his court takes judicial notice of the fact that Jefferson County and Yates County do not adjoin and, in fact, are separated by over 100 miles and several large lakes."). This court has already held that, "while the court has no evidence of the full number of parks, schools, child care facilities, and recreation

32

areas in Nashville, the court can take judicial notice of what anyone else in the city can see: that those locations are numerous and spread throughout at least much of the city." (Doc. No. 39 at 37.)

Jordan's claims might have benefited from more detailed evidence; maps presented in support of similar claims in front of Judge Richardson of this court, for example, "clearly" showed "that a large portion of Davidson County is unavailable to Plaintiffs and other registered sex offenders." *Doe #1 v. Lee*, 518 F. Supp. 3d 1157, 1188 (M.D. Tenn. 2021). Even without that level of precision, however, the court can conclude that the Act's geographic restrictions are sufficiently severe that inclusion on the registry is at least sufficiently comparable to banishment to weigh in favor of a finding that the Act is punitive in Tennessee, just as was the case in Michigan.

There is also nothing in this case that would render the Act more rationally related to its government purpose than the laws at issue in *Snyder*. Particularly notable is the fact that the Act, like the Michigan law, treats individuals with absolutely no documented history of any kind of sexual contact with, or attraction to, minors as if they nevertheless pose a significant risk of preying on children unless restrained and supervised. There is no evidence in the record that Jordan has ever committed—or even so much as considered committing—a sexual act on a minor. Indeed, the woman that he did rape was more than two decades his senior, when he was barely an adult himself. Nevertheless, the Act simply takes it as a given that Jordan is so much of a risk to children that it is unacceptably dangerous for him to even live or work near a school.

The only supposed rational purpose that the defendants can identify for such a policy is a poorly-defined interest in public safety. Yet the Governor and Commissioner also concede, at least for the purposes of summary judgment, that they do not actually have any evidence that the

restrictions imposed on individuals like Jordan make crimes, let alone crimes against children, less likely. At most, the defendants point to evidence establishing, unremarkably, that there is an ongoing risk that *someone* in Tennessee will commit sex crimes, which, the defendants argue, justifies restraining Jordan and others with similar convictions since those individuals might go on to be the perpetrators. But that thin argument could just as readily support policies that would obviously constitute *ex post facto* punishments, such as retroactive increases in prison sentences. In order for the Act to qualify as a prophylactic, civil safety regime, there needs to be at least some tailoring of its restrictions to actual, demonstrable risks. Instead, the Act simply imposes its restrictions automatically on every person convicted by a jury of committing a certain type of criminal offense—in other words, like a punishment.

The remaining *Mendoza-Martinez* factors, as interpreted by *Snyder*, similarly support Jordan's challenge. The Sixth Circuit found that Michigan's restrictions on "where registrants may live, work, and 'loiter'" amounted to an affirmative restraint, *Snyde*r, 834 F.3d at 703, and the same analysis applies to the Act, which also restricts where a registrant may live or work and simply replaces "loiter" with "[s]tand [or] sit idly." Tenn. Code Ann. § 40-39-211(d)(1)(B). The Sixth Circuit's conclusion that the Michigan scheme "advance[d] all the traditional aims of punishment: incapacitation, retribution, and specific and general deterrence" can be imported, effectively word-for-word, into an analysis of Tennessee's Act. *Snyder*, 834 F.3d at 704. Finally, the Sixth Circuit's conclusion regarding the excessiveness of Michigan's system was based on the fact that "the statute's efficacy [was] at best unclear," while "its negative effects are plain on the law's face." *Id.* at 705. The same is true of the Act; its efficacy is questionable, particularly with regard to some of its more overreaching restrictions, but the substantial negative effect on the registrant is undeniable.

What Jordan has presented is a case that, in every meaningful way, falls squarely within the analysis of *Snyder*, with the exception that *Snyder* involved a somewhat more voluminous and detailed factual record. Under some substantive standards, that more limited record might prevent the court from resolving a case on summary judgment. The *Mendoza-Martinez* factors, however, look at the broad, general features of a law on its face. They do not call for a fine-grained analysis of the day-to-day effects of a law on any given person in any given situation, because the factors are designed to render a verdict regarding whether a law is punitive or non-punitive with regard to *everyone*. While some laws might nevertheless present a close enough call that the minute details nevertheless end up mattering a good deal, that is not the case here. *Snyder* overwhelmingly supports a holding that the Act is punitive for *Ex Post Facto* Clause purposes, even in the absence of a more comprehensive factual record. The court, accordingly, will grant Jordan summary judgment as to liability against the Director and the Governor.

## B. Metro's Municipal Liability

A local government is responsible under § 1983 only for its "own illegal acts. [It is] not vicariously liable under § 1983 for [its] employees' actions." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (internal citations and quotation marks omitted). Accordingly, a city can only be held liable under § 1983 if the plaintiff demonstrates that the alleged violation of federal law was a direct result of a municipal policy or custom. *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 693 (1978)); *Regets v. City of Plymouth*, 568 F. App'x 380, 393–94 (6th Cir. 2014)). A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4)

the existence of a custom or tolerance or acquiescence of federal rights violations. *Burgess*, 735 F.3d at 478. Jordan argues that he has satisfied that test because he is suing Metro based on its existing policy and custom of proactively enforcing the Act indiscriminately against all offenders, including ones whose offenses took place before 1995.

It is currently unsettled in the Sixth Circuit whether and when a municipality can violate § 1983 by enforcing a state law alleged to be unconstitutional. Insofar as other circuit courts have addressed the issue of municipal liability based on the municipality's actions under a flawed state law, they have been divided, although many of the relevant holdings have involved fine distinctions that might allow the cases to be reconciled. *Compare Whitesel v. Sengenberger*, 222 F.3d 861, 872 (10th Cir. 2000) (stating that a local government "cannot be liable for merely implementing a policy created by the state," although liability may attach if the local government was the "moving force" behind the violation); *Bockes v. Fields*, 999 F.2d 788, 791 (4th Cir. 1993) (holding that county board did not incur municipal liability by exercising case-specific discretion under state-created personnel policy)*; Surplus Store and Exch., Inc. v. City of Delphi*, 928 F.2d 788, 791 (7th Cir. 1991) ("It is difficult to imagine a municipal policy more innocuous and constitutionally permissible, and whose causal connection to the alleged violation is more attenuated, than the 'policy' of enforcing state law.") *with Evers v. Cty. of Custer*, 745 F.2d 1196, 1201 (9th Cir. 1984) (holding that local government's issuance of declaration consistent with state law was sufficient policymaking to create municipal liability); *Cooper v. Dillon*, 403 F.3d 1208, 1222–23 (11th Cir. 2005) (holding that municipality could be liable for enforcing an unconstitutional state statute when state law did not require enforcement).

In this litigation, Jordan has urged the court to follow the lead of the Second Circuit in *Vives v. City of New York*, 524 F.3d 346 (2d Cir. 2008), and conclude that municipal liability can

be premised on the local government's "conscious choice" to enforce a particular unconstitutional prohibition over which it had enforcement discretion.[18] *Id.* at 352. The Second Circuit, in *Vives*, acknowledged that municipal liability must be based on a policy and that "[t]he word 'policy' generally implies a course of action consciously chosen from among various alternatives." *Id.* at 350. Accordingly, the court reasoned, a city cannot be held liable for its enforcement of a state law that "mandat[es] enforcement by municipal police officers," because it had no choice in the matter. *Id.* at 353. "On the other hand," the Second Circuit reasoned, "if a municipality decides to enforce a statute that it is authorized, but not required, to enforce, it may have created a municipal policy." *Id.*

The Second Circuit, however, stopped short of suggesting that a municipality's general policy of enforcing state criminal prohibitions would be sufficient to turn every such act of enforcement into a municipal policy for § 1983 purposes. Rather, "a municipal policymaker [must] have focused on the particular statute in question" and made the conscious choice affirmatively to enforce it. *Id.* at 353. In light of those principles, the Second Circuit adopted a two-part test: first, the court must determine whether a municipal government had a "meaningful choice" in whether and how to enforce the relevant state law; and, if the capacity for a meaningful choice did exist, the court must determine whether the relevant "discrete policy to enforce" the relevant law "represented a conscious choice by a municipal policymaker." *Id.*

This court has already held that *Vives* supplies the appropriate test in this case and will not reiterate every aspect of its analysis. In short, *Vives* is consistent with (1) the principles underlying *Monell*, (2) the general division of responsibilities between state and local

_____

[18] Metro suggests that Jordan "has abandoned the *Vives* analysis." (Doc. No. 66 at 4 n.4.) This is not true. While Jordan does not specifically cite *Vives* in his relatively brief discussion of this issue in his Response to the defendants' motions, Jordan's fuller discussion of municipal liability in support of his own motion continues to cite *Vives* and pursues an argument consistent with that approach. (*See* Doc. No. 50 at 16, 20.)

37

governments in Tennessee, and (3) the Sixth Circuit's analysis in the most relevant case from this circuit, *Garner v. Memphis Police Department*, 8 F.3d 358 (6th Cir. 1993). Metro has not identified any basis for departing from that holding, so the court will continue to apply *Vives*. (Doc. No. 42 at 17–22.)

The court also sees no reason to revisit its earlier conclusion that, under Tennessee law, the MNPD had discretion in its enforcement of the Act. A county law enforcement agency has a general statutory duty "to patrol the roads of the county, to ferret out crimes, to secure evidence of crimes, and to apprehend and arrest criminals," Tenn. Code Ann. § 38-3-102(b), but nothing about the language of that statutory duty or the relevant caselaw requires the agency to pursue the arrest or prosecution of every offender in the county's jurisdiction. To the contrary, the Tennessee Supreme Court has made clear that, unless a specific mandatory enforcement duty is established by statute, Tennessee's grants of enforcement powers to local law enforcement are "permissive" and do not "impose a mandatory duty to arrest every" violator. *Ezell v. Cockrell*, 902 S.W.2d 394, 403 (Tenn. 1995). MNPD's discretion in this area is confirmed by the fact that there *are* a handful of specific areas in which local law enforcement in Tennessee has mandatory enforcement duties. *See, e.g.,* Tenn. Code Ann. § 6-54-401 ("lewdness, drunkenness, gaming, and the sale and manufacture of intoxicating liquors"); Tenn. Code Ann. § 38-3-107 (riots and breaches of peace); Tenn. Code Ann. § 38-3-108 ("being armed with the intention of committing a riot or affray, or of assaulting, wounding, or killing another person, or of otherwise breaking the peace"). While Metro has some mandatory administrative duties under the Act, it has identified no mandatory duty to enforce the Act against every offender (or, indeed, against any particular offender) by, for example, routinely showing up at the offender's home unannounced or sending a dozen officers in a fleet of police cars to arrest him for not having paid an

38

administrative fee. If Metro wished not to enforce the Act against individuals whose crimes occurred before the registry's creation, it could do so. That satisfies the first *Vives* inquiry and opens the door to the second.

There is, moreover, no plausible argument that Metro reasonably could have been ignorant of the fact that its policy was, as a matter of practical effect, a policy of enforcing the Act retroactively against individuals like Jordan. Metro knew about registrants' offense dates, because that information was not only in the registry but affirmatively furnished as part of the registrants' routine tracking and verification forms. (*See* Doc. No. 49-1 at 2.) The effective date of the Act was public knowledge and was undoubtedly known by Metro itself, as a law enforcement agency. The idea that no one at Metro realized that MNPD was enforcing the Act retroactively would be simply implausible even if Jordan himself had not repeatedly complained about the existence of such a policy, which he did.

That said, *Vives* requires more than knowledge; it requires the municipal defendant to have consciously selected the policy at issue. Metro's Rule 30(b)(6) witness was asked about Metro's policies, and, although aspects of the testimony could have been clearer, the witness's response supports the conclusion that Metro did, in fact, have an affirmative policy of universal or near-universal enforcement of the Act:

> Q.     All right. Let's talk, actually, specifically just briefly about arrests and prosecution of offenders, okay?
>
> A.     Okay.
>
> Q.     All right. So are there -- you know, are there any kind of standards or guidelines, you know, that Metro has for when [the registry detectives] should arrest and file charges against a SORA violator?
>
> A.     When they've investigated and confirmed there's a violation.

Q.      Okay. And so at that point, once they've investigated and confirmed that
        there is a violation, then they should arrest and prosecute?

A.      They would take out warrants, yes.

Q.       Okay. All right. And that's the Metro policy? That's the Metro policy?

A.       If they're going to prosecute, yes, it is.

(Doc. No. 49-9 at 82–83.)

The additional context uncovered in discovery, moreover, belies any possibility that
Metro's policy was the result of MNPD's unthinking enforcement of the law as written as a
matter of course. Metro has devoted substantial resources and attention to designing its registry
enforcement program, which extends well beyond Metro's straightforward statutory duties under
the Act or its general policy of enforcing ordinary state criminal laws. Metro even undertook a
reorganization that gave registry enforcement its own unit within MNPD. Metro, moreover, did
not simply enforce registry violations when it happened to learn of them. It actively sought them
out—including with regard to Jordan himself and others like him—through its home
verifications. And it continued its practices despite concerns being raised repeatedly, both
publicly and in direct dealings with Jordan himself, about *ex post facto* enforcement. Metro's
complex, orchestrated, and aggressive strategy of enforcing the Act against all registrants,
despite the fact that it was clear that that meant enforcing the Act retroactively, simply cannot be
squared with the passive picture that Metro now attempts to paint of its actions. The court
therefore concludes that Jordan is entitled to summary judgment as to liability against Metro, on
the ground that Metro unconstitutionally enforced the Act against him pursuant to a consciously
selected policy made pursuant to its enforcement discretion.

# V. CONCLUSION

For the foregoing reasons, Jordan's Motion for Summary Judgment as to Liability (Doc. No. 49) will be granted, Metro's Motion for Summary Judgment (Doc. No. 52) will be denied, and the Motion for Summary Judgment filed by the Governor and Director (Doc. No. 55) will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge